2000 ME 179

**SAWYER ENVIRONMENTAL RECOVERY FACILITIES, INC.**

v.

**TOWN OF HAMPDEN et al.**

Supreme Judicial Court of Maine.

Argued June 12, 2000.
Decided Oct. 24, 2000.

Catherine R. Connors (orally), Philip F.W. Ahrens III, Helen L. Edmonds, Pierce Atwood, Portland, for plaintiff.

Thomas A. Russell (orally), Nathaniel M. Rosenblatt, Farrell, Rosenblatt & Russell, Bangor, for defendants.

---

1. The Town has reconfigured and renumbered the lots on its tax maps since 1974. Lots 45, 46, and 47 are now depicted on Tax Map 9 as Lots 44–1, 45–1, 46, and 46A. We make reference to the original lot numbers in order to avoid confusion.

Panel: WATHEN, C.J., and CLIFFORD, DANA, SAUFLEY, and ALEXANDER, JJ.

ALEXANDER, J.

[¶ 1] The Town of Hampden appeals the order of the Superior Court (Penobscot County, *Kravchuk, J.*) granting Sawyer Environmental Recovery Facilities, Inc.'s Rule 80B appeal from (i) a decision of the Hampden Zoning Board of Appeals affirming the Hampden Code Enforcement Officer's (CEO) decision that two proposed landfill expansion projects constituted prohibited expansions of a nonconforming use; and (ii) a subsequent decision of the Hampden Planning Board that these projects cannot receive site plan approval based on the Zoning Board's approval of the CEO's land use determination. Because state law preempts the Town's capacity to absolutely prohibit expansion of the landfill, we vacate and remand.

## I. FACTS AND PROCEDURE

[¶ 2] Sawyer Environmental Recovery Facilities (SERF) operates a private, commercial solid waste disposal facility (the landfill) on land located in Hampden. The district in which the landfill is located is zoned for industrial use. SERF's predecessor-in-interest first sought a permit to operate the landfill in 1974. Sawyer's 1974 application requested a permit "to operate a sanitary landfill facility on land owned by Lawrence Brown, Ruby Burke, [and] Fred Oxley (Lots 44–45–46)...." [1] The application did not suggest any limitations on the landfill boundaries within the listed lots.

[¶ 3] Under the then applicable 1964 ordinance, a landfill was not a permitted use within the industrial zone. Presumably on this basis, the building inspector denied Sawyer's 1974 application. On appeal, the Hampden Zoning Board of Appeals (ZBA) granted a permit to operate the landfill on the condition that Sawyer follow all appli-

cable Department of Environmental Protection (DEP) guidelines and monitoring requirements. The permit included no space or coverage limitations within the three lots subject to the permit. The parties have stipulated that the Board's approval of the application constituted the grant of a variance as well as a permit because the landfill was not a permitted use within the industrial zone.[2]

[¶ 4] In 1975, SERF separately sought and obtained DEP approval to operate the landfill. The footprint of the proposed landfill, indicated in the 1975 application, covered an area within but not coextensive with Lots 44, 45, and 46. The landfill as it existed within this footprint is described by the parties as the "conventional landfill."

[¶ 5] In 1979, the Town enacted a comprehensive zoning ordinance that imposed stricter guidance on the process for granting conditional uses and variances, subjected such uses to site plan reviews, and prohibited expansion of nonconforming uses as the ordinance defined that term.[3] The ordinance also changed the general description of industrial uses, but maintained the status that a landfill was not a use allowed in the industrial zone.

[¶ 6] SERF operated the conventional landfill until its closure in the early 1980s. Since the closure of the conventional landfill, SERF's operations proceeded with a series of "secure"[4] landfills situated on top of the conventional landfill. This litigation concerns Secure III, Phases VI, VII, and VIII.

[¶ 7] In September 1996, SERF filed a Preliminary Information Report with the DEP, seeking a determination of public benefit for a proposed expansion of Secure III. Pursuant to 38 M.R.S.A. § 1310–AA (Supp.1999), the DEP concluded that development of Secure III, Phases VI through VIII would "provide a substantial public benefit" and "meet [the] immediate, short-term and long-term capacity needs of the State."

[¶ 8] In March 1998, pursuant to 38 M.R.S.A. §§ 1310–N(1) & 1310–S (Supp. 1999), SERF filed an application with the DEP for a license allowing them to commence operation of Phases VI through VIII. Prior to filing, SERF notified the Town of its intent to submit the application and held a public informational meeting in accordance with DEP regulations. Pursuant to 38 M.R.S.A. § 1310–S(3), the Town was granted automatic municipal intervenor status in SERF's application process.

[¶ 9] With the support of a $50,000 intervenor assistance grant, *see* §§ 1310–S(4) & 1310–T (Supp.1999), the Town hired an independent technical consultant and conducted an independent review of SERF's application. This process included a series of "stakeholder meetings" occurring between July and October 1998, attended by the DEP, SERF, and the Town's representatives. On October 2, 1998, the Town's technical consultant and representative submitted a final summary of the Town's technical comments, indicating those changes SERF had agreed to incorporate in the project as a result of the Town's independent review. The summary concluded that "[w]ith these

---

**2.** Because of this stipulation, we need not consider whether the 1974 approval was a variance or a permit. As such, we also need not consider the potential legal implications under the ordinance of designating the approval as a variance or a permit. *Cf. DeSomma v. Town of Casco,* 2000 ME 113, ¶ 13, 755 A.2d 485, 489.

**3.** The changes made by the 1979 comprehensive zoning ordinance are discussed in more detail at ¶¶ 15–17 *infra.*

**4.** The designation "secure" refers to a type of landfill that is required pursuant to DEP regulations for the disposal of certain types of waste such as oil and incinerator ash. SERF's secure landfills are lined and contain pumps that transport leachate from the base of the landfill to a storage pond, the content of which is transported to wastewater treatment facilities.

commitments and application changes, the technical issues we have raised have been addressed and our intervenor review is complete."[5]

[¶ 10] On October 20, 1998, the DEP approved SERF's application to construct and operate Secure III, Phases VI, VII, and VIII. Despite its participation in the intervenor review process, the Town appealed the DEP's approval of the license application to the Board of Environmental Protection (BEP). The BEP denied the appeal and affirmed the order granting SERF the license, but modified some conditions and added other minor conditions to the license. No appeal was taken from this BEP action.

[¶ 11] On November 20, 1998, SERF applied to the CEO for site plan approval of Secure III, Phases VI, VII and a portion of VIII. The CEO concluded that (i) SERF's landfill constitutes a nonconforming use that is subject to ordinance provisions prohibiting the expansion of nonconforming uses; and (ii) Phase VI and Phase VII are prohibited because they are to be built on land not situated within the conventional landfill's footprint, which the CEO determined to be the extent of any grandfathered, preexisting use. The CEO approved construction of Phase VIII because it will be built atop the conventional landfill. On February 25, 1999, SERF appealed the CEO's decision to the ZBA. Following an extended hearing, the ZBA affirmed the CEO's decision on April 27, 1999.

[¶ 12] SERF filed its first complaint in the Superior Court on March 25, 1999, advancing the claim that State solid waste management laws, 38 M.R.S.A. §§ 1302–1310–AA (1989 & Supp.1999), preempt the Town's ordinance (count I). On May 5, 1999, SERF filed an amended complaint, retaining the preemption claim (count I), and adding a Rule 80B appeal (count II), a claim for inverse condemnation (count

III), and a claim pursuant to 42 U.S.C. § 1983 (count IV). Subsequently, the Town Planning Board determined that it lacked jurisdiction due to the ZBA's prior decision, preventing it from considering SERF's site plan application. SERF appealed the Planning Board's decision to the ZBA, which denied the appeal. SERF then filed a separate Rule 80B appeal of this ruling to the Superior Court. These appeals were consolidated by an order of the court (*Hjelm, J.*). The Superior Court (*Kravchuk, J.*) granted SERF's 80B appeal, determining that the Hampden Zoning Ordinance did not prohibit the landfill expansion. The court dismissed SERF's other counts, and remanded the case to the ZBA for further proceedings consistent with the opinion. The Town filed a timely appeal to this Court.

[¶ 13] When the Superior Court has acted as an intermediate appellate court, we review directly the decision of a local zoning board of appeals. *See De-Somma v. Town of Casco*, 2000 ME 113, ¶ 7, 755 A.2d 485, 487. We examine the ZBA's decisions for abuse of discretion, error of law, or findings unsupported by substantial evidence in the record. *See Richert v. City of S. Portland*, 1999 ME 179, ¶ 6, 740 A.2d 1000, 1002. The burden of persuasion in an action challenging the decision of a zoning authority falls on the party seeking to overturn the authority's decision. *See Toussaint v. Town of Harpswell*, 1997 ME 189, ¶ 6, 698 A.2d 1063, 1065.

## II. VARIANCES AND NONCONFORMING USES

[¶ 14] This case first requires us to address whether the status of SERF's sanitary landfill, permitted pursuant to the 1974 variance, is changed by the provisions of the 1979 comprehensive zoning ordi-

**5.** The letter was addressed to the Hampden Town Manager, but a copy was directed to the DEP.

nance, as amended, that limit the expansion of preexisting, nonconforming uses and continue the prohibition of landfills in the industrial district or anywhere else in the Town.

[¶ 15] The 1964 ordinance which formed the basis for the 1974 variance did not designate a landfill as either a permitted use or a use permitted as an exception within the industrial district. Section 3.2 of the 1979 ordinance addresses uses permitted in the industrial district. As with the 1964 ordinance, the 1979 ordinance omitted landfills from its lists of permitted uses and conditional uses. The 1979 comprehensive zoning ordinance also made changes by: (i) revising the general description of industrial uses; (ii) reclassifying "uses permitted by exception" as "conditional uses" and changing the description of those uses; and (iii) subjecting both categories of uses to site plan review.[6]

[¶ 16] The 1979 ordinance also added significant direction regarding nonconforming uses.[7] Section 4.5 prohibits the expansion of a nonconforming use. Section 7.2 defines nonconforming use as the "use of land, or portion thereof, existing at the effective date of adoption or amendment of this Ordinance which does not conform to all applicable provisions of this Ordinance." Expansion is defined as the "addition of weeks or months to a use's operating season; additional hours of operation; or the use of more floor area or ground area devoted to a particular use."[8]

[¶ 17] In sum, the 1979 ordinance adopted a new process for restricting the expansion of nonconforming uses, and reworded the descriptions of permitted and conditional uses within the industrial zone. The 1979 ordinance did not expressly state that landfill uses would be prohibited in the industrial zone. Rather, it maintained the prior ordinance's omission of a landfill under the category of permitted uses.

 [¶ 18] A variance is authority extended to a landowner to use property in a manner prohibited by a zoning ordinance absent such a variance. *See Cope v. Town of Brunswick*, 464 A.2d 223, 226 (Me.1983); *Stucki v. Plavin*, 291 A.2d 508, 511 (Me. 1972). This authority is usually granted after a quasi-judicial determination that,

6. As amended, Article 5 of the 1964 ordinance outlined the permitted uses within the industrial zone as follows:

 a. Permitted Uses: Manufacturing; sale, storing, not involving junk; truck terminal; wholesale; repair, service and sale of motor vehicles; accessory uses customarily incidental to above uses exemplified by office, laboratory, and watchman's dwelling; one sign pertaining to premises and not larger than 36 sq. ft.

 Section 3.2.2 of the 1979 ordinance, as amended, describes permitted industrial uses as follows:

 *Permitted Uses (Subject to Site Plan Review)* Facilities for manufacturing, compounding, processing, packaging, essential service, treatment or warehousing of goods and products, wholesale distribution, retail sales where such activities are part of and accessory to an industrial use, such facilities having less than five thousand (5,000) square feet of gross floor area. Accessory uses and structures.

 Thus, insofar as SERF's landfill use is concerned, the 1979 ordinance rewords the prior general description of permitted industrial uses. The 1979 ordinance also subjects all industrial uses to site plan review when a new facility or an expansion is sought.

7. The 1964 ordinance did not contain any prohibition on the expansion of nonconforming uses. Rather, it excepted from the ordinance's regulations "structures and uses, existing at the time the ordinance is enacted."

8. In 1995, the Town passed an amendment to this definition. The definition currently defines expansion of use as "the addition of months to a use's operating season; the use of more floor area or ground area; the increase in the volume or height of a use, including but not limited to the storage or disposal of materials of any kind; or the extraction of additional material such as gravel excavation." The Town did not apply this definition to Secure III, Phases VI through VIII, apparently because the amendment was only discovered after SERF's site plan application was submitted and because it was not yet incorporated into the published version of the ordinance. Because the 1995 amendment was not addressed in the Superior Court, we do not address it here.

on the facts presented, a "strict application of the ordinance to the [landowner] and the [landowner's] property would cause undue hardship."[9] 30–A M.R.S.A. § 4353(4) (Supp.1999). Variances are meant to encompass those:

> [s]ituations ... where the application of zoning to a particular piece of property practically destroys or greatly decreases its value for any permitted use to which it can reasonably be put, and where the application of the ordinance bears so little relationship to the purposes of zoning that, as to that property, the regulation is, in effect, confiscatory or arbitrary.

*Lovely v. Zoning Bd. of Appeals of the City of Presque Isle,* 259 A.2d 666, 669 (Me.1969) (quoting *Libby v. Bd. of Zoning Appeals,* 143 Conn. 46, 118 A.2d 894, 896 (1955)).

[¶ 19] A use permitted by a variance is distinct from a nonconforming use, because a use permitted by a variance becomes conforming under the ordinance that authorizes the issuance of the variance. *See, e.g., Dimitrov v. Carlson,* 138 N.J.Super. 52, 350 A.2d 246, 249 (App.Div. 1975); *Borer v. Vineberg,* 213 A.D.2d 828, 623 N.Y.S.2d 378, 380 (1995); *In re Angel Plants, Inc. v. Schoenfeld,* 154 A.D.2d 459, 546 N.Y.S.2d 112, 113 (1989). SERF quotes a leading treatise that states "a use established or maintained pursuant to a variance granted by an administrative body is not a nonconforming use." ROBERT M. ANDERSON, AMERICAN LAW OF ZONING § 6.01 at 483 (4th ed.1995). However, this statement does not support the proposition that uses permitted by a variance are not subject to restrictions on nonconforming uses enacted after the variance was issued.[10]

[¶ 20] This case concerns the narrower question of whether a use made conforming by a variance under one ordinance remains a conforming use when a subsequently adopted comprehensive ordinance confirms the nonpermitted and nonconforming nature of the use. In *Lovely,* we addressed obliquely the nonconforming use issue presented here in the course of determining whether a landowner's circumstance amounted to an "undue hardship" entitling him to obtain a variance to operate a grocery store in an agricultural zone. *See id.* at 667. The ordinance at issue in *Lovely* provided that the zoning board could grant a variance when necessary to avoid an undue hardship. *See id.* In the course of addressing whether an undue hardship existed, we considered the landowner's argument that his was a special circumstance because:

> he had at some time in the past enjoyed a non-conforming use, granted by way of variance, a right subsequently lost by the application of the Ordinance, ... which provides in part, 'If ... any nonconforming use is discontinued for a period of one year ..., the future ... use of the premises or structure shall thereafter be in conformity with the provisions of this ordinance.'

*Id.* at 670. We stated, "The Board was not required to grant a variance which would

---

9. Variances may be granted if the landowner proves that: (1) there would be no reasonable return on the property if used for the purpose allowed in the zone; (2) the plight of the owner is due to the unique circumstances rather than general conditions in the neighborhood and may reflect upon the unreasonableness of the zoning ordinance; (3) the use will not alter the essential character of the locality; and (4) the current or previous landowner has not caused the hardship. *See Barnard v. Zoning Bd. of Appeals of the Town of Yarmouth,* 313 A.2d 741, 749 (Me.1974); 30–A M.R.S.A. § 4353(4) (Supp.1999).

10. Most of the cases SERF relies on involve variances that were granted after the governing ordinance came into effect and pursuant to its provisions. *See Hoffmann v. Gunther,* 245 A.D.2d 511, 666 N.Y.S.2d 685 (1997); *In re Angel Plants, Inc. v. Schoenfeld,* 154 A.D.2d 459, 546 N.Y.S.2d 112 (1989); *James v. Town of New Hartford,* 49 A.D.2d 247, 373 N.Y.S.2d 938 (1975); *Industrial Lessors, Inc. v. City of Garfield,* 119 N.J.Super. 181, 290 A.2d 737 (App.Div.1972).

re-establish a non-conforming use merely because one had existed at some time in the past." *Id.*[11]

[¶ 21] Although a variance renders a proposed use conforming so long as that use complies with the restrictions within the variance, this determination is based upon the ordinance and the facts at the time of the variance application. It is not a determination for all time that the use will remain conforming. As time passes, the needs and development of a community may change. Municipalities can reevaluate the mix of uses in a zone and decide that a particular use should no longer be permitted. *See Barnard v. Zoning Bd. of Appeals of the Town of Yarmouth*, 313 A.2d 741, 746–47 (Me.1974) (noting that communities are able to stabilize growth and prevent trends they find inappropriate even if those trends have already begun). *See also Warren v. Mun. Officers of the Town of Gorham*, 431 A.2d 624, 628 (Me. 1981) (noting that zoning ordinances must be motivated by a concern for the "public health, safety, morals or general welfare"). Thus, our cases have held that "provisions of a zoning regulation for the continuation of [nonconforming] uses should be strictly construed, and provisions limiting nonconforming uses should be liberally construed" in order to allow for the eventual elimination of nonconformity. *See Oliver v. City of Rockland*, 1998 ME 88, ¶ 9, 710 A.2d 905, 908.

■ [¶ 22] The practical effect of a variance is to establish uses pursuant to the variance as conforming uses. However, such a conforming use may become nonconforming when a comprehensive ordinance is subsequently enacted that reasserts the nonpermitted nature of that use and imposes additional limitations on its extension. The practical effect of such a rule is that conforming uses conducted pursuant to a use variance are placed on an equal footing with conforming uses that are permitted under a prior ordinance.

[¶ 23] Because the 1979 ordinance reestablished the nonpermitted nature of the landfill use and imposed new criteria and conditions on any variance, SERF's use of Lots 44, 45, and 46 became nonconforming under the provisions of the 1979 ordinance. The ZBA's conclusion that Phases VI and VII of Secure III constitute a prohibited expansion of a nonconforming use is not clearly erroneous.

## III. PREEMPTION

[¶ 24] Having determined that the Town may bar the SERF expansion as a prohibited extension of a nonconforming use, we must address whether such an absolute prohibition is preempted by State solid waste management laws, 38 M.R.S.A. §§ 1302–1310–BB (1989 & Supp.1999).

[¶ 25] The home rule provision of the Maine Constitution, art. VIII, pt. 2, § 1 reads as follows: "The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character. The Legislature shall prescribe the procedure by which the municipality may so act."

[¶ 26] Standards for determining whether a local action is preempted are set out in 30–A M.R.S.A. § 3001(3) (1996) which states: "The Legislature shall not be held to have implicitly denied any power granted to municipalities under this section unless the municipal ordinance in question would frustrate the purpose of any state law."

■ [¶ 27] Thus, the inquiry on a preemption question is whether the local ac-

---

**11.** Although this holding appears to be on point, the facts are not sufficiently presented to enable us to assure that *Lovely* governs this case. There is no way to determine with certainty whether a variance was actually granted previously, whether the landowner simply posited that such a variance must have existed based on the fact that the grocery store had been in operation for approximately 12 years, or whether the use was simply a preexisting use at the time the ordinance was enacted.

tion "would frustrate the purpose of any state law." Interpreting section 3001(3) in *School Comm. of Town of York v. Town of York*, 626 A.2d 935 (Me.1993), we stated that municipal action will be viewed as preempted only where application of the municipal ordinance prevents the efficient accomplishment of a defined state purpose. *See id.* at 938–39 n. 8; 940–41 (citing Report of the Joint Standing Committee on Local and County Government on the Revision of Title 30 at 11 (Dec.1986)). We also indicated that an action under a municipal ordinance will be preempted only when state law is interpreted to "create a comprehensive and exclusive regulatory scheme" inconsistent with the local action. *See id.* at 941 (citing *Central Maine Power Co. v. Town of Lebanon*, 571 A.2d 1189, 1193 (Me.1990)).

[¶ 28] We addressed preemption in the context of the solid waste management laws in *Midcoast Disposal, Inc. v. Town of Union*, 537 A.2d 1149 (Me.1988). There, the Town of Union had enacted a solid waste disposal ordinance that banned private commercial disposal services. *See id.* at 1150. We held that state law created a comprehensive and exclusive regulatory scheme that "manifested a clear legislative intention to remove any authority a municipality may have had to prohibit the establishment and operation of a private facility within its borders for the disposal of out-of-town solid waste." *Id.* at 1151.[12]

[¶ 29] Title 38 M.R.S.A. § 1302 (Supp. 1999), the solid waste management law declaration of policy, provides, among other things, that "environmentally suitable sites for waste disposal are in limited supply and represent a critical natural resource," and that:

> needed municipal waste recycling and disposal facilities have not been developed in a timely and environmentally sound manner because of diffused responsibility for municipal waste planning, processing and disposal among numerous and overlapping units of local government[, and] that direct state action is needed to assist municipalities in separating, collecting, recycling and disposing of solid waste, and that sound environmental policy and economics of scale dictate a preference for public solid waste management planning and implementation on a regional and state level.

38 M.R.S.A. § 1302. This provision supports a role for the State in municipal solid waste management.

[¶ 30] Consistent with this authority, 38 M.R.S.A. § 1304(1) (Supp.1999) provides, in pertinent part, that the DEP "may adopt, amend and enforce rules as it deems necessary to govern waste management, including the location, establish-

---

12. Title 30–A M.R.S.A. § 4359 (1996), which was in effect at the time of the *Midcoast* decision but was not mentioned in it, provides in pertinent part:

> It is the policy of this State, with respect to commercial landfill facilities ... [t]o affirm the importance of State and municipal control over the ... substantial expansion of existing commercial landfill facilities[ ] and ... to recognize that any municipality may, under its home rule authority, enact a moratorium on the issuance or processing of any municipal permit for ... the substantial expansion of a commercial landfill facility, as defined by Title 38, section 1303, subsection 11–B. (P.L.1989, ch. 104 § A, 45 (reenacting P.L.1987, ch. 737 § A, 1 & ch. 822 § 1)).

Section 4359 supports the ability of the Town to exert some control over any "sub-

stantial expansion" of SERF. Title 38 M.R.S.A. § 1303 (11–B)(1989) formerly defined "substantial expansion of a commercial landfill facility" as "an expansion of an existing licensed commercial waste facility by more than 50%, as measured by either volume of waste or land area affected, whichever is more of its currently licensed operation ...." Section 1303 has been repealed and reenacted as section 1303–C. *See* P.L.1989, ch. 890 § B–225. Section 1303–C(37) changes the definition of substantial expansion to "more than 25%" from "more than 50%" but leaves other parts of the definition basically the same. However, even though the Legislature has not repealed 30 M.R.S.A. § 4359, and assuming it has not been impliedly repealed, section 4359 is inapplicable because the Town has not "enacted a moratorium."

ment, construction and alteration of waste facilities as the facility affects the public health and welfare or the natural resources of the State." Title 38 M.R.S.A. § 1310–N (Supp.1999) provides that "[n]o person may locate, establish, construct, expand the disposal capacity of or operate any solid waste facility unless approved by the [DEP]." Section 1310–N(1)(B) provides that the DEP will license a solid waste facility provided that it finds, *inter alia*, that "the facility provides a substantial public benefit" pursuant to subsection 3–A.

[¶ 31] When state and municipal approval and regulation of solid waste management facilities come into conflict, standards for resolution of the conflict are stated in 38 M.R.S.A. § 1310–U.[13] Section 1310–U indicates that municipalities may regulate external impacts of solid waste management facilities, but may not impose on solid waste management facilities stricter standards than are contained in state law. Authorizing regulation "not more strict than" state law necessarily bars any total municipal prohibition on expansion of a solid waste management facility, while authorizing a municipality to participate in regulation of external impacts to the extent its ordinances provide for such regulation. *Cf. Hutchinson v. Cary Plantation,* 2000 ME 129, ¶¶ 8–15, 755 A.2d 494, 496–

98 (reviewing 38 M.R.S.A. § 1305(6) and the appropriate balance of State approval and municipal regulation of external impacts of septage disposal sites).

[¶ 32] The limited municipal role is further evidenced by 38 M.R.S.A. § 1310–S that provides for municipal participation in the DEP licensing process. It was pursuant to this section that the Town was granted "automatic municipal intervenor status" and received a $50,000 assistance grant to conduct an independent review of SERF's application. *See id.,* § 1310–S(3–A) & (4); *see also id.* § 1310–T. It would make little sense for the Legislature to craft this process for expansion approval and include express provision for significant local participation, then after approval, allow the municipality to negate the proceedings and prohibit the expansion. Such an after the fact and absolute prohibition of the expansion prevents the "efficient accomplishment" of the "defined state purpose" of proper management of expansion of solid waste disposal facilities. *See School Comm. of Town of York v. Town of York,* 626 A.2d at 940–41.

[¶ 33] Thus, we conclude that the Hampden Zoning Ordinance which, as applied by the Town, absolutely bans the location and expansion of landfills within the Town, is preempted by the State solid waste man-

---

13. 38 M.R.S.A. § 1310–U (1989 & Pamph. 2000) states:

§ 1310–U. **Municipal ordinances**

Municipalities are prohibited from enacting stricter standards than those contained in this chapter and in the solid waste management rules adopted pursuant to this chapter governing the hydrogeological criteria for siting or designing solid waste disposal facilities or governing the engineering criteria related to waste handling and disposal areas of a solid waste disposal facility. Except as provided in section 2173, municipalities are further prohibited from enacting or applying ordinances that regulate solid waste disposal facilities owned by the office or a regional association.

Under the municipal home rule authority granted by the Constitution of Maine, Article VIII, Part Second and Title 30–A, section 3001, municipalities, except as provided in this section, may enact ordinances

with respect to solid waste facilities that contain standards the municipality finds reasonable, including, without limitation, conformance with federal and State solid waste rules; fire safety; traffic safety; levels of noise heard outside the facility; distance from existing residential, commercial or institutional uses; ground water protection; surface water protection; erosion and sedimentation control; and compatibility of the solid waste facility with local zoning and land use controls, provided that the standards are not more strict than those contained in this chapter and in chapter 3, subchapter I, articles 5–A and 6 and the rules adopted under these articles. Municipal ordinances must use definitions consistent with those adopted by the board.

A municipality adopting an ordinance under this section shall forward a copy of the ordinance to the commissioner within 30 days of its adoption.

agement laws establishing a comprehensive regulatory scheme under which the State, through the DEP, regulates the location and expansion of landfills.

[¶ 34] Because the Town's actions prohibited consideration of the SERF application, it does not appear that the Planning Board reached the issue of any regulation of local impacts that may be authorized by section 1310–U, if existing ordinances allow for any regulation of such impacts. Thus, the matter must be remanded to the Superior Court to remand to the Town to reinstate consideration of SERF's applications for the purposes indicated in the opinion.

The entry is:

Judgment vacated. Remand to the Superior Court to remand to the Town for further consideration consistent with this opinion.