MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2021 ME 38
Docket:       Yor-20-131
Argued:       April 6, 2021
Decided:      July 13, 2021

Panel:        MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

KEVIN J. HILL

v.

TOWN OF WELLS et al.

CONNORS, J.

[¶1]  Appellee Kevin Hill sought two setback variances from the Town of Wells Zoning Board of Appeals (ZBA) and was denied on the basis that he did not meet his burden of proof to show that granting the variances would not alter the essential character of the locality.  Hill's appeal to the Superior Court (York County, *Douglas, J.*) resulted in the court's rejection of the ZBA's denial of the variances, and an abutting landowner, intervenor Bradley Hastings, has appealed.  We vacate the Superior Court's judgment and remand with instructions to affirm the ZBA's denial.  The ZBA properly decided that Hill failed to show that the size and character of his proposed residence with the variances would conform with the neighborhood as zoned, discounting

2

grandfathered nonconforming structures, and would not degrade the significant value of surrounding environmental resources.

## I.  BACKGROUND

[¶2]  In 2017, Hill purchased a lot located at 12 Lobster Lane on Drakes Island in Wells.[1]  The lot is approximately two blocks from the beach and borders on, and intrudes into, wetlands.  These particular wetlands are of special significance because they are contiguous to both coastal wetlands within the meaning of the Natural Resources Protection Act (NRPA), 38 M.R.S. §§ 480-A through 480-JJ (2021), as well as the Rachel Carson National Wildlife Refuge.

[¶3]  Hill purchased the lot undeveloped and began the process of obtaining the necessary permits to build on the property.  Because of the lot's proximity to the wetlands, Hill's proposed structure required a variance from the Town "[t]o reduce the front setback to Lobster Lane from 20 feet to 10 feet" and "[f]or a freshwater wetland setback reduction from 38.5 feet to no less than 25 feet for rear setback at the structure's closest point."[2]  The size of the lot, the

---

[1]  We take judicial notice of the lot's size, its location, and the characteristics of the abutting properties by way of Google Maps.  *See Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (collecting cases).  During oral argument, we asked the parties if there were any objections to our use of Google Maps for this purpose, and neither party expressed any opposition.

[2]  Pursuant to chapter § 145-33(B)(1) of the Town Code, "[t]he minimum setback from the upland edge of a wetland shall be 75 feet, which may be reduced to the average of the setbacks of structures

state and local regulations, and the dimensions potentially available under the variances limit the house that Hill intended to build to a footprint of just 680 square feet.[3] The small footprint of Hill's proposed home resulted in a plan to build the structure up to three stories high, with the ground level to be used for parking.

[¶4] In July 2018, Hill sought and received from the Department of Environmental Protection (DEP) a NRPA permit to build a 1274-square-foot structure on the lot. The DEP's order expressly stated: "This approval does not constitute or substitute for any other required state, federal or local approvals nor does it verify compliance with any applicable shoreland zoning ordinances." Thus, the DEP's approval did not eliminate Hill's need to obtain a variance from the Town's ZBA based on its independent fact-findings and conclusions.

---

within 200 feet of the proposed structure on lots abutting the wetlands but shall not be less than 25 feet." *See* Wells, Me., Code § 145-33(B)(1) (Apr. 16, 1999). The ZBA's findings of fact indicate that the setbacks from the four abutting properties within 200 feet of Hill's proposed home are 37.33 feet, 43.26 feet, 13.48 feet, and 68 feet. The average of those setbacks is 38.5 feet, which is therefore the allowable setback for Hill's structure.

[3] Although the ZBA's decision indicates that the total square footage of the home would be 680 square feet, the record, including Hill's permit application to the Department of Environmental Protection, makes clear that the ZBA was referring to the house's footprint.

4

[¶5] In February 2019, Hill submitted his variance request to the Town, pursuant to chapter § 145-67(A)(3) of the Town Code, arguing that he would suffer undue hardship absent the variance. In March 2019, the ZBA held a public hearing on Hill's application that included submissions and testimony from the owners of the abutting properties—including the intervenor in this case, Bradley Hastings. One abutting landowner testified that Hill's lot is "always wet" and that there is "plenty of water in that lot."[4]

[¶6] On April 1, 2019, the ZBA voted on its findings of fact and its conclusions. The ZBA's findings of fact provided, in relevant part:

- Structures on all abutting properties were built prior to adoption of the Code by the Town of Wells. The structure on one abutting property has been renovated since 2004.

- Four abutting properties within 200 feet of the proposed structure on lots abutting the wetlands have setbacks of 37.33 feet, 43.26 feet, 13.48 feet, and 68.00 feet respectively from the boundaries of the wetlands. The allowed average setback for the proposed structure is 38.49 feet. One of the abutting properties has a setback smaller than the requested 25 feet, which is smaller than the average 38.49 feet. [Hill] stated that only a two square-foot area can be built upon within required setbacks.

- A survey completed in 2012 determined that the average of the setbacks of structures within 200 feet of the proposed

---

[4] The report from the DEP submitted to the ZBA also detailed "water flowing across the southern corner of [Hill's] lot towards the lower elevations on the western corner of the lot," though this is not the portion of the lot where Hill proposed to construct the home.

structure on lots abutting the wetlands was 33.49 feet, updated to 38.5 feet to reflect recent removal of a shed.

The ZBA further concluded:

- The size of the structure (680 square feet)[5] would make it much smaller than all other homes in the neighborhood.

- The impacts on and by the wetlands are unique for this property in comparison to abutting properties because the border of the wetlands is inside the area of the lot and virtually all of the wetlands [are] in the setbacks.

Based on these findings, the ZBA determined that Hill failed to meet his burden of showing that the variance would not alter the essential nature of the neighborhood.

[¶7] Following the ZBA's denial of his variance application, Hill appealed to the Superior Court pursuant to M.R. Civ. P. 80B. The Superior Court vacated the ZBA's determination and remanded to the ZBA with instructions to grant the variance, concluding that Hill had met his burden of proof, compelling the ZBA to issue the variance. Hastings timely appealed.

---

[5] *See supra* n.3.

## II. DISCUSSION

### A. Burden of Proof and Standard of Review

[¶8]  On an appeal from a Superior Court order where the court acted in its intermediate appellate capacity to hear an appeal from a municipal zoning board, we "review directly the operative decision of a municipality."  *Toomey v. Town of Frye Island*, 2008 ME 44, ¶ 11, 943 A.2d 563.  In doing so, we will not "substitute [our] judgment for that of a board."  *Id.*  "[T]he party wishing to overturn the municipal decision," in this case Hill, bears the burden of persuasion on appeal.  *Toomey*, 2008 ME 44, ¶ 13, 943 A.2d 563.  "[T]he party bearing the burden of proof before the Board . . . must show on appeal that the evidence compelled the Board to grant him a variance."  *Twigg v. Town of Kennebunk*, 662 A.2d 914, 916 (Me. 1995).

### B. Applicable Legal Framework

#### 1. Relevant Statutes

[¶9]  A municipal board of appeals "may grant a variance only when strict application of the ordinance to the petitioner and the petitioner's property would cause undue hardship."  30-A M.R.S. § 4353(4) (2021). The term "undue hardship" requires the party seeking a variance to meet four conditions,

including that "[t]he granting of a variance will not alter the essential character of the locality." *Id.* § 4353(4)(C).[6]

[¶10]    Other legislation, including multiple statutes protecting and conserving sensitive environmental resources, governs the use of this geographic area and Hill's property specifically.

[¶11]    This property lies within the Drakes Island Game Sanctuary. 12 M.R.S. § 12706(E) (2021).  Under 12 M.R.S. § 12701 (2021), the permissible uses of property within a sanctuary are limited and are subject to rules adopted by the Commissioner of Inland Fisheries and Wildlife.  For example, in the absence of a Commissioner rule to the contrary, with some exceptions, no trapping or hunting of any wild animal or wild bird is allowed within the area. *Id.* §§ 12701, 12707.

[¶12]   The second piece of legislation that affects this property is the NRPA, which governs land use on and near wetlands.  The Legislature has found and declared that

> the State's . . . freshwater wetlands, significant wildlife habitat [and]
> coastal wetlands . . . are resources of state significance.  These
> resources have great scenic beauty and unique characteristics,
> unsurpassed recreational, cultural, historical and environmental

---

[6]   Because all four conditions must be met, we need not address the ZBA's additional finding that Hill failed to meet another requirement, namely that the need for the variance is not self-created by the applicant or a prior owner.  30-A M.R.S. § 4353(4)(D) (2021).

value of present and future benefit to the citizens of the State and . . . uses are causing the rapid degradation and, in some cases, the destruction of these critical resources, producing significant adverse economic and environmental impacts and threatening the health, safety and general welfare of the citizens of the State.

38 M.R.S. § 480-A.

[¶13]  Another piece of legislation that affects this area and Hill's property by mandating shoreland zoning is 38 M.R.S. § 435 (2021), in which the Legislature stated:

To aid in the fulfillment of the State's role as trustee of its waters and to promote public health, safety and the general welfare, it is declared to be in the public interest that shoreland areas be subject to zoning and land use controls.  Shoreland areas include those areas within 250 feet of the normal high-water line of any great pond, river or saltwater body, within 250 feet of the upland edge of a coastal wetland, within 250 feet of the upland edge of a freshwater wetland except as otherwise provided in section 438-A, subsection 2, or within 75 feet of the high-water line of a stream. The purposes of these controls are to further the maintenance of safe and healthful conditions; to prevent and control water pollution; to protect fish spawning grounds, aquatic life, bird and other wildlife habitat; to protect buildings and lands from flooding and accelerated erosion; to protect archaeological and historic resources; to protect commercial fishing and maritime industries; to protect freshwater and coastal wetlands; to control building sites, placement of structures and land uses; to conserve shore cover, and visual as well as actual points of access to inland and coastal waters; to conserve natural beauty and open space; and to anticipate and respond to the impacts of development in shoreland areas.

[¶14] Under this statute, local ordinances must, among other things, address the coastal management policies set forth in 38 M.R.S. § 1801 (2021). 38 M.R.S. § 438-A(2). In section 1801, the Legislature finds that

> the Maine coast is an asset of immeasurable value to the people of the State and the nation, and there is a state interest in the conservation, beneficial use and effective management of the coast's resources; that development of the coastal area is increasing rapidly and that this development poses a significant threat to the resources of the coast . . . .

The Legislature further declares "that the well-being of the citizens of this State depends on striking a carefully considered and well reasoned balance among the competing uses of the State's coastal area" and that state and local agencies should conduct their activities affecting the coastal area consistent with various listed policies, including "[d]iscourag[ing] growth and new development in coastal areas where, because of coastal storms, flooding, landslides or sea-level rise, it is hazardous to human health and safety" and "[p]rotect[ing] and manag[ing] critical habitat and natural areas of state and national significance and maintain[ing] the scenic beauty and character of the coast even in areas where development occurs." *Id.*

[¶15] Finally, Hill's property borders the Rachel Carson National Wildlife Refuge, which is part of the National Wildlife Refuge System, a national network of lands and waters designated for conservation and restoration of fish, wildlife,

and plant resources and their habitats. *See* 16 U.S.C.S. § 668dd (LEXIS through Pub. L. No. 116-344).

[¶16]  None of these environmental protection statutes precluded the ZBA from granting the variances requested by Hill. *See* 38 M.R.S. § 439-A(4); *Peterson v. Town of Rangeley*, 1998 ME 192, ¶¶ 13-16, 715 A.2d 930. They do, however, indicate that this locality is of particular environmental sensitivity, and they identify public health and welfare interests relevant to assessing development in the area, including habitat protection, avoiding flooding and wetland degradation, and preserving open space and natural beauty.

2.     Relevant Ordinances

[¶17]  The property Hill seeks to develop lies within the Residential D District, and, consistent with 38 M.R.S. § 1801, is also subject to a Shoreland Overlay District.

[¶18]  Chapter 145-23, defining the Residential D District, provides:

A.     Purpose. The purpose of the Residential D District is to retain the family resort character of Drakes Island by ensuring that future development is similar to the existing development in style and scale. Nonresidential uses should be limited to noncommercial recreational uses and public uses.

Uses permitted in the District are limited to agriculture, one-family dwellings, keeping poultry, and recreation. Wells, Me., Code § 145-23(B) (June 9, 2015).

Dwellings are limited to a height of thirty feet and three stories and must be set back twenty feet from any lot line abutting any street right of way. *Id.* §§ 145-23(F)(5), (G)(2).

[¶19]    Chapter 145-33, defining the Shoreland Overlay District,[7] provides:

> A.    Purpose.  The purpose of this district is to prevent and control water pollution; to protect fish spawning grounds, aquatic life and bird and other wildlife habitat; to protect buildings and lands from flooding and accelerated erosion; to protect commercial fishing and maritime industries; to protect freshwater and coastal wetlands; to conserve shore cover; and to preserve access to inland and coastal waters.

The setbacks required include seventy-five feet from the upland edge of a wetland, "which may be reduced by the average of the setbacks of structures within 200 feet of the proposed structure on lots abutting the wetlands but shall not be less than 25 feet." *Id.* § 145-33(B)(1).

---

[7] "Overlay zoning is a flexible zoning technique that allows a municipality to limit development in certain environmentally sensitive areas.  An overlay zone is a mapped overlay district superimposed on one or more established zoning districts.  Environmental overlay district boundaries may be drawn to follow the boundaries of a natural resource, such as a watershed or floodplain.  An overlay zone supplements the underlying zoning standards with additional requirements that can be designed to protect the natural features in an important environmental area.  A parcel within the overlay zone is regulated simultaneously by two sets of zoning regulations: the underlying zoning district provisions and the overlay zoning requirements.  A unique natural or aesthetic resource area, such as a pine barren, wetland resource area, watershed, or tidal basin, can be identified and protected in this way."  John R. Nolon, *In Praise of Parochialism: The Advent of Local Environmental Law*, 26 Harv. Envtl. L. Rev 365, 391 (2002) (footnote omitted).

12

[¶20] In sum, the purposes of these ordinance provisions echo those of the relevant statutes, such as protecting natural resources and avoiding flooding and wetland degradation, with large setbacks from wetlands and a focus on residential and recreational uses.[8]

3. The Nature of the "Essential Characteristics" Requirement

    a. The meaning of "Essential Characteristics of the Locality" is informed by its context as a variance criterion and the purposes and limitations imposed upon uses, structures, and dimensions within the district.

[¶21] We have noted that when an ordinance broadly provides that uses are permitted in a district as long as they do not alter the essential characteristics of the locality, the breadth of that language results in an excessive delegation of authority to the administrative body to determine whether to permit the use. *Cope v. Town of Brunswick*, 464 A.2d 223, 226-27

---

[8] Another relevant ordinance provision would ordinarily be the provision setting forth local variance criteria. An erroneous section of the Wells Ordinance was included in the appendix. We cannot take judicial notice of ordinances. *Mills v. Town of Eliot*, 2008 ME 134, ¶ 23, 955 A.2d 258. Upon notification of this omission, the parties confirmed that the wrong section had been included in the appendix but did not seek to modify the appendix or otherwise provide a certified copy of the applicable section.

It appears that other ordinance provisions might also require additional fact-finding before granting a variance from setbacks from wetlands. But the ZBA did not mention these criteria, the appellant did not argue that these criteria applied before the ZBA, and, again, we cannot take judicial notice of any ordinance provision outside an administrative record or appendix. We therefore focus on the variance criteria provided by statute, which, as identified by the ZBA in its decision, are identical to the applicable criteria applied by the ZBA, including the requirement that the variance not alter the essential characteristics of the locality. *See* Wells, Me., Code § 145-67(A)(3) (Nov. 2, 1993).

(Me. 1983). This delegation problem does not arise in the variance context, however, because this criterion, along with the other statutory conditions for granting a variance, constitute limitations on the ZBA's discretion. *Your Home, Inc. v. Town of Windham*, 528 A.2d 468, 472 (Me. 1987). In other words, in the context of a variance, a municipality acting as a legislature has identified the permitted uses, and the essential characteristics criterion is limited by the ordinance's provisions regarding the permitted uses and the purposes of the district. *See id.* ("[V]ariances are uses which are generally inappropriate for the zone in which they are located.").

[¶22] Additionally, "[v]ariances are meant to encompass those[] situations . . . where . . . the application of the ordinance bears so little relationship to the purposes of zoning that, as to that property, the regulation is, in effect, confiscatory or arbitrary." *Sawyer Env'tl Recovery Facilities, Inc. v. Town of Hampden*, 2000 ME 179, ¶ 18, 760 A.2d 257 (quotation marks omitted). The discretion of a board in the application of the "essential characteristics" variance criterion is thus limited not only by the specific provisions in an ordinance defining the characteristics of a district, but, also, by the guiding perspective that a variance should not be granted unless the party seeking the variance can prove that there is something unique about his property that

makes adherence to the uses, structures, and dimensions permitted within the district inconsistent with the purposes of the zoning for that district. *See Radin v. Crowley*, 516 A.2d 962, 964 (Me. 1986) ("The proper inquiry [in determining whether to grant a variance] is whether application of the side yard setback requirement to Radin's lot arbitrarily deprives her of a beneficial use of her land without materially advancing any of the police power purposes underlying and justifying enactment of the requirement.").

        b.     The size of the locality is context dependent and not limited to developed uses and values.

[¶23] The identification of the locality, or neighborhood, for the purpose of determining compatibility of a use with the area's essential characteristics is necessarily fact-sensitive and dependent upon the nature of the geographic area the variance may impact. That said, the districts, as legislatively established by the municipality, provide strong guidance in identifying the locality or neighborhood. Here, for example, chapter § 145-23, defining the Residential D District, references the purpose of this District as retaining the character of "Drakes Island." It follows that the impact of any variance within this area is a relevant consideration. *See Janssen v. Holland Charter Twp. Zoning Bd. of Appeals*, 651 N.W.2d 464, 468 (Mich. Ct. App. 2002) ("In considering the essential character of this locality, one cannot, and should not, just look at the

immediate neighboring properties. The character of the locality is defined in broader strokes than such a myopic viewpoint would provide.").

[¶24] It also follows that the locality here includes the abutting undeveloped Refuge and wetlands. *See Davis v. Zoning Bd. of Chatham,* 754 N.E.2d 101, 110-11 (Mass. App. Ct. 2001) (noting that "neighborhood" is an elastic term depending upon facts and circumstances, and that it was appropriate for zoning purposes to include undeveloped beaches, coastal banks, marshes, and wetlands as part of the neighborhood for the purposes of defining character).

[¶25] Impact is measured not only in economic terms, but also in terms of the effect on environmental values.[9] While the adverse impact of a variance on the market value of surrounding developed property might be relevant in assessing the effect on essential characteristics of a locality, the purpose of zoning is broader, relating to the public interest and welfare.[10] The importance

---

[9] Inclusion of such values in variance considerations is reflected in 30-A M.R.S. § 4353(4-B) and (4-C), which allow a municipality to enact an ordinance relaxing the statutory variance criterion requiring that the property be incapable of producing a reasonable return under certain circumstances, *see infra* n.10, but limiting that relaxation with respect to wetland setbacks. Section 4-C(E) also specifically recites that there must be no unreasonable adverse effect on the natural environment. *See Rowe v. City of S. Portland*, 1999 ME 81, ¶¶ 9-10, 730 A.2d 673.

[10] The essential characteristics prong was first identified in *Otto v. Steinhilber*, 24 N.E.2d 851, 853 (N.Y. 1939). *See Lovely v. Zoning Bd. of Appeals*, 259 A.2d 666, 669 (Me. 1969). In support of its development of the essential characteristics prong, the *Steinhilber* court cited Edward M. Bassett et al., *Model Laws for Planning Cities, Counties, and States: Including Zoning, Subdivision Regulation, and Protection of Official Map* at 12 (1935), which stated: "The power of variance falls within the

16

of environmental impact is particularly strong with respect to properties lying within an overlay district, which is designed, as noted *supra*, to protect environmentally sensitive areas. *See generally* Robert J. Blackwell, Comment, *Overlay Zoning, Performance Standards, and Environmental Protection After Nollan*, 16 B.C. Envtl. Aff. L. Rev. 615 (1989).

> c.     The variance must be compatible with the district as zoned, not just surrounding nonconforming uses and dimensions.

[¶26] Finally, key in determining the essential characteristics of a locality are the uses, structures, and dimensions of setbacks and other features already existing in that area. Here, the relevant ordinance expressly provides that new development should be similar to "existing" development, which would include nonconforming structures. That said, the analysis is not constrained to considering only grandfathered uses and structures—otherwise, every applicant for a variance could obtain the equivalent of grandfathered status without having to be consistent with the municipality's zoning for the area.

---

well-recognized general class of relaxations or mitigations of the strictness of general rules in which broad discretion is so commonly, as in this case, granted the administrator by relating it to considerations of the public interest, public safety and welfare, and substantial justice." *See* Zoning and Land Use Controls, Ch. 9, Introduction, § 53A.01 (LexisNexis Matthew Bender) (stating that Bassett "is often viewed as the father of the concept [of zoning] in this country"). For a historical overview as to how environmental concerns have always been components of and justifications for zoning, *see* Earl Finbar Murphy, *Euclid and the Environment*, contained in *Zoning and the American Dream: Promises Still to Keep* (Charles M. Haar & Jerold S. Kayden eds., 1989) at 154, 168-74.

[¶27]  In *Radin*, 516 A.2d at 964, for example, the party seeking a variance argued that she was entitled to a setback variance because the goal of zoning was uniformity and her use would be consistent with the present nonconforming uses in the immediate area.  We stated that this argument "misconstrue[d] both the nature of the uniformity imposed by zoning and the method by which uniformity is attained."  *Id.*  The relevant uniformity is that defined in the zoning ordinance; otherwise, "no municipality could ever effectively impose restrictions on areas with a large number of extant nonconforming uses, for exceptions and variances would of necessity be granted almost as a matter of course."  *Id.*; *see also Surfrider Found. v. Zoning Bd. of Appeals*, 358 P.3d 664, 686-89 (Haw. 2015) (reversing the grant of a variance from the setback requirement on essential characteristics grounds and rejecting the evidence of similar nonconformity in the area as competent evidence because the presence of nonconforming uses and structures should not serve as the basis for further nonconformance).

[¶28]  A goal of zoning is to eliminate, not perpetuate, nonconformance. *Lovely*, 259 A.2d at 669-70; *see also O'Toole v. City of Portland*, 2004 ME 130, ¶ 15, 865 A.2d 555 (stating that variance decisions should not be divorced from "a community's contemporary planning objectives").  Hence, while we would

not go so far as the Hawaii Supreme Court in concluding that surrounding nonconforming uses are irrelevant to the determination of the essential characteristics of a locality, nonconforming uses are not determinative and their significance is discounted if they are inconsistent with the purposes of the existing zoning scheme.

C.     Application of the Law to Hill's Request for Variances

[¶29]   It was Hill's burden to prove that the variance would result in development compatible with the locality.  He showed only that the immediate abutters' houses were nonconforming, and the record lacks evidence that his house would be similar in size and height to others.  There are indications, including the satellite photos from Google Maps, that it would not.  But even without reference to those photographs, given that the burden lay with Hill, it was within the discretion of the ZBA, which had knowledge of the area, to conclude that he failed to meet his burden based on the evidence that he did provide, or the lack thereof.  *See Pine Tree Tel. & Tel. Co. v. Town of Gray*, 631 A.2d 55, 57 (Me. 1993) (holding that local board members may rely on their personal knowledge of the area at issue); *Driscoll*, 441 A.2d at 1029

(sustaining a local zoning board's ruling on essential characteristics given the board members' familiarity with the neighborhood).[11]

[¶30]  The record as to the environmental impact of the variances also does not compel the conclusion that the environmental purposes of the Shoreland Overlay District would be met by allowing a variance from the wetland setback.  *See Radin*, 516 A.2d at 964 (affirming the denial of a variance because the applicant did not demonstrate that the purposes of the setback requirement were not advanced by their application to her lot).

[¶31]  In support of his application, Hill submitted a copy of the DEP's approval of the requested setback under the NRPA.  As that approval expressly provides, however, that approval did not verify compliance with the Town's shoreland zoning ordinances, and the ZBA was free to determine that a larger setback was required, supported by record evidence regarding neighborhood flooding issues.

[¶32]  Setbacks prevent overcrowding on substandard lots and maintain vistas.  Given the language in the Ordinance establishing allowed setbacks by

---

[11] The characterization of uses is a mixed question of law and fact, subject to deference on appeal. *Jordan v. City of Ellsworth*, 2003 ME 82, ¶ 9, 828 A.2d 768 ("[W]e review the interpretation of the ordinance de novo, but we afford the ZBA's ultimate characterization of the structure substantial deference.").

averaging existing setbacks, *see supra* n.2, the grant of a variance here would further erode the setback required for any further development in the area. This lot sits on the edge of a wildlife refuge, with wetlands intruding into a good portion of the lot. The ZBA was not compelled to determine that no further reduction in setback requirements was warranted in order to maintain the environmentally sensitive values of the locality.[12]

The entry is:

> The judgment of the Superior Court is vacated. Remanded for entry of a judgment affirming the decision of the Town of Wells Zoning Board of Appeals.

---

[12] As noted in *Sawyer Env'tl Recovery Facilities, Inc. v. Town of Hampden*, 2000 ME 179, ¶ 18, 760 A.2d 257, a primary function of variances, aside from avoiding arbitrary limits on property use unwarranted by the zoning scheme, is to avoid confiscation. *See also* 2 Anderson's American Law of Zoning § 13:1 (Patricia E. Salkin ed., 5th ed. 2021) (stating that variances are "escape hatches"). One of the statutory criteria for granting a variance is that the party seeking the variance must prove that the property "cannot yield a reasonable return unless a variance is granted." 30-A M.R.S. § 4353(4)(A). We take no position as to whether Hill's inability to build the residence he seeks to build absent a variance provides a viable ground for a regulatory taking claim but note that the ZBA's finding that this variance criterion was met—a finding that neither the Town nor Hastings appealed—was based on an incorrect legal conclusion that the criterion is met whenever a property owner cannot build a residence absent the variance. *See Toomey v. Town of Frye Island*, 2008 ME 44, ¶¶ 17-18, 943 A.2d 563.

Keith P. Richard, Esq. (orally), Libby O'Brien Kingsley & Champion, LLC, Kennebunk, for appellant Bradley Hastings

Alan E. Shepard, Esq. (orally), Shepard & Read, Kennebunk, for appellee Kevin J. Hill

York County Superior Court docket number AP-2019-18
FOR CLERK REFERENCE ONLY