STATE OF MAINE                                      BUSINESS AND CONSUMER COURT

CUMBERLAND, ss                                   Location: Portland

Docket No.: BCD-AP-12-010

*AMH -CUM- 5/8/2013*

|  |  |
|---|---|
| PETER BECKFORD and JULIE BECKFORD, | ) ) ) |
| Petitioners, | ) ) ) |
| v. | ) ) ) |
| TOWN OF CLIFTON, | ) ) ) |
| Respondents, | ) ) ) |
| and | ) ) ) |
| PISGAH MOUNTAIN, LLC | ) ) ) |
| Intervenor | ) ) ) |

*✓*

## DECISION AND ORDER

This case arises out of the decision of the Town of Clifton Planning Board (Planning Board) to approve Pisgah Mountain, LLC's (Pisgah) site plan application to construct and operate a wind energy project in the Town of Clifton, Maine. Peter and Julie Beckford (the Beckfords) reside on and own property located near the site of the proposed wind energy project and have appealed, pursuant to M.R. Civ. P. 80B, the Planning Board's decision to approve the project. (R. 716; A. tab 4.)[1] The Town of Clifton Zoning Board of Appeals (Board of Appeals) affirmed the Planning Board's decision on January 30, 2012. (A. tabs 1, 2.) For the reasons set forth below, the Court affirms the decision of the Planning Board in part and remands for further findings.

---

[1] Respondent Town of Clifton submitted the record in this case in six binders. Several documents, however, were not included in those binders and instead were submitted in Respondent's Appendix. Petitioners also submitted an appendix, but their appendix is limited to items already in the record. The Court accordingly cites to the official record as "R." and the Respondent's Appendix as "A."

1

## BACKGROUND

I.   ADMINISTRATIVE PROCESS

On June 8, 2010, the Town of Clifton adopted "The Land Use Ordinance of the Town of Clifton, Maine" (hereinafter, CLUO). (R. 1670-1896.) Relevant to this appeal, the CLUO requires the Planning Board to review and approve the site plan for construction and operation of an industrial wind project. (R. 1708-27, 1821, 1824.) As with other site plans, the Planning Board must "consider all applicable standards and requirements of the [CLUO]" and make "findings of fact in regard to whether the provision of [the CLUO] have been met." (R. 1708.) In the case of an industrial wind project, the application must comply with Article 6's general site plan review requirements and Article 14's wind-project specific requirements. (R. 1824.) The burden of demonstrating compliance is on the applicant. (R. 1724, 1821.)

On August 11, 2010, Pisgah commenced the formal site plan approval process and continued to submit application materials at regular planning board meetings throughout the fall of 2010. (R. 711.) On January 18, 2011, Pisgah submitted a site plan review application to the Town's Code Enforcement Officer (CEO), who determined it to be complete.[2] (R. 712.) The Planning Board confirmed that finding on February 16, 2011, and began reviewing the application at a regular Planning Board meeting on March 2, 2011. (R. 712.) From the period between March 2 and September 29 of 2011, the Planning Board reviewed the application at workshops, public hearings, and regularly scheduled meetings. (R. 712.) During this period, a group of concerned town residents, including the Beckfords, expressed their opposition to the proposed wind energy project. (R. 714-17, 893-94, 963, 965 968, 1017-24, 1152-59, 1229-30, 1237-41, 1347 50.) The Beckfords retained counsel, and throughout the process, either they or

---

[2] Upon gathering all the submission requirements, Article 6 of the CLUO directs the applicant to submit the completed application form to the CEO who then forwards the application on to the Planning Board. (R. 1717-18.)

their attorney submitted letters and attended regular meetings, workshops, and public hearings. (R. 1017-25, 1152-59, 1190-1207.)

As noted, the Beckfords own and reside on property in Clifton, less than a mile from the project site. (A. tab 4.) The Beckfords allege that prior to August 11, 2010, the date of Pisgah's formal site application, they had built a 100-square foot cabin on their land, which was below the threshold to require a building permit from the town. (R. 714.) During the pendency of Pisgah's wind project application, the Beckfords decided to construct a second cabin. (R. 1020.) On November 10, 2010, the Beckfords applied for a building permit to construct this second cabin, and the CEO issued the Beckfords a building permit to construct a 120 square foot, one-story "accessory cabin." (R. 1020, 1060.) The application described the cabin as insulated without plumbing or electric and the issued permit stated that the Beckfords could neither rent nor use this cabin "as a full time residential structure." (R. 1054, 1059-60.)

The Planning Board held a public hearing on Pisgah's application on April 6, 2011, followed up with another workshop on May 11, 2011, and, subject to a few conditions, granted the project provisional approval on June 8, 2011.[3] The Planning Board held a second public hearing on September 29, 2011, followed up with a regularly scheduled meeting on October 5, 2011 and issued its Final Notice of Decision, approving the Project application, on October 12, 2011. (R. 712.)

As would be expected given the lengthy process and the numerous requirements on Pisgah, the Planning Board's decision was similarly lengthy. On December 19, 2011, the Beckfords filed an appeal from the Planning Board's Final Decision to the Town's Board of Appeals. (R. 1656.) The Board of Appeals held a public hearing on January 5, 2012, deliberated on the appeal on January 16, 2012, and then remanded certain matters to the Planning Board

---

[3] The Planning Board ultimately incorporated the findings in its Provisional Notice of Decision dated June 1, 2011, into its Final Approval with corrections for various scrivener's errors. (R. 714.)

for additional findings. (A. tab 1 at 1; *see* A. tab 6 at 1 of 5 (listing items requested for additional clarification and review).) The Planning Board adopted further findings on January 24, 2012. (A. tab 6 at 1 of 5.) The Board of Appeals further considered the Beckfords' appeal in light of the Planning Board's supplemental findings on January 25, 2012, and affirmed the Planning Board's final decision on January 30, 2012. (A. tab 1 at 1, 3.)

II.    THE PLANNING BOARD'S DECISION

The Planning Board found that Pisgah was applying for the high impact non-residential use of an industrial wind project in Growth Management Area (GMA) 3, thus mandating that Pisgah meet the CLUO requirements in Article 6 for site plan review; Article 12, table 12D for high impact, non-residential uses in GMA 3; and Article 14, section 8 for the wind project specific standards. (R. 1011.) Because only certain portions of the Planning Board's decision are at issue in this appeal, the Court limits its factual recitation to the relevant CLUO standards and corresponding Planning Board findings contained in the June 8, 2011, provisional approval, the October 12, 2011, approval, and the Planning Board's additional findings upon the Board of Appeal's remand. The Court begins with the general site plan review standards, then the high impact, non-residential uses standards, and finally the wind project specific standards.

A.    Art. 6: Financial Capacity

As part of the general site plan review requirements of Article 6, an applicant must provide documentation of its financial ability to complete the project. (R. 1713.) The Pisgah wind energy project is estimated to cost $20 million. (R. 832.) As evidence of its financial capacity to carry out construction and operation of the wind energy project, Pisgah provided the Planning Board with two letters, one from Camden National Bank and another from Cianbro, each expressing an interest in financing the project. (R. 245, 250, 714.) The Planning

4

Board reviewed both letters along with an estimated budget and concluded that Pisgah demonstrated financial capacity to do the project. (R. 714, 718, 720, 1019.)

B.    Art. 6: Environmental Impact

Article 6 also requires the Planning Board to determine that any proposed project "will not cause undue environmental harm." (R. 1713.) To make that determination the Planning Board may request that the applicant provide "a written Environmental Impact Statement . . . in sufficient detail for the [Planning Board] to ascertain what the potential impact of the project may be on the development and on adjoining land." (R. 1713.) The impact statement must include a "thorough technical analysis of the facts," a "complete and objective presentation of the potential impacts," and a "detailed action plan to address the potential negative impacts." (R. 1713.) The CLUO identifies twenty possible impacts that a proposed project might have on the surrounding area that an applicant must address and discuss in the impact statement. (R. 1714-15.)

Pisgah's impact statement addressed the twenty specific criteria, sometimes citing to other areas of its application for further explanation. (R. 25-29, 1012-1014.) In response to concerns that the project might adversely impact avian and terrestrial wildlife, Pisgah provided the Planning Board with letters from the Maine Department of Inland Fisheries and Wildlife and the Maine Department of Conservation. (R. 715.) The Maine Department of Inland Fisheries and Wildlife stated it had no record of "rare botanical features documented specifically within the project area." (R. 93-97.) The Maine Department of Conservation stated the project would not encroach upon any "Essential or Significant Wildlife Habitat." (R. 93-97.) The Planning Board reviewed the letters, the responses to each of the twenty criteria, and an approval from the Maine Department of Environmental Protection (MDEP)

5

and found that for most of the criteria, the project would have little or no impact. (R. 715, 719-20, 1012-14.)

The Planning Board did find the project had the potential for soil erosion and adverse impact on roads and highways during construction; however, those impacts would be mitigated by adhering to State rules and regulations as well as Pisgah's mitigation plan for soil erosion. (R. 1012.) The Planning Board also found the project would impact aesthetics by altering ridgelines, however, the project would not directly impact ridge tops and geographic sites protected and preserved in the Clifton Comprehensive Plan. (R. 1013-14.) The Planning Board further found the project would impact other development in town by consuming land that may otherwise be developed for housing, however, this impact would be mitigated because the project would preserve land and provide renewable energy. (R. 1013.) The Planning Board concluded that the "positive impact on local development offset any adverse development and that any adverse impact to the landscape and aesthetics would not "significantly diminish the recreational, living, and working experience of the vast majority of residents and visitors." (R. 1014.) Finally, the Planning Board determined that the five industrial wind turbines would alter landscapes, yet they would have "no greater visual impact" on the area than the seven telecommunication towers on top of nearby Black Cap Mountain. (R. 1014.)

C.    Art. 12: Turbine Height Standard

Article 12 provides the following for the maximum height of unoccupied structures in a high impact Tier 3 use in GMA 3: "Unoccupied structures with height exceeding 35 feet will be subject to height restrictions as determined by the [Planning B]oard to be appropriate and necessary for the proposed use." (R. 1794.) The Planning Board did not specifically address this requirement in its decision, but found generally that Pisgah had complied with the CLUO's requirements such that it granted Pisgah's application. (R. 727.)

6

D.    Art. 14: Setback Requirements

One of the wind project specific standards in Article 14, § 8 of the CLUO mandates that each wind turbine be "set back not less than 4,000 feet from any residence, business, school, daycare facility, church, hospital or other Occupied Structure . . . ." (R. 1833.) An "Occupied Structure" is "a building in which people, live, work or frequent." (R. 1822.)

The Planning Board found that two cabins the Beckfords built on their property were not "occupied structures," as that term is defined in the CLUO, and therefore that the project complied with the CLUO requirement that wind turbines be setback at least 4,000 feet from occupied structures. (R. 714-17, 1020-23.) The Planning Board concluded that the cabins could not qualify as "'occupied structures' when they are not associated with a legal wastewater disposal system." (R. 717.) The Planning Board also found that it had "substantially reviewed the application by the time the Beckfords applied for a permit to build the second cabin." (R. 1021.)

E.    Art. 14: Decommissioning Bond

Article 14, § 8 of the CLUO requires an industrial wind project applicant to submit a "Decommissioning and Site Restoration Plan." (R. 1827-28.) This plan must "include provisions for financial surety to ensure completion of decommissioning and site restoration, in form and amount satisfactory to the Planning Board." (R. 1827.) The ordinance further provides that

> [a] performance bond or a cash escrow account held by the Town with 5% of the estimated cost of decommissioning to be added by the wind energy facility on an annual basis shall be acceptable surety, the total amount to be based on the estimated cost of completing the decommissioning and site restoration in accordance with the approved plan, adjusted for inflation, and as approved by the Planning Board.

(R. 1827-28.)

7

Pisgah submitted a Decommissioning and Site Restoration Plan (R. 1017), which the Planning Board found to be an adequate and reasonable study. (R. 715, 725, 1019, 1033.) The Planning Board concluded, as a condition to the operating permit, that the Pisgah "will provide decommissioning surety in the amount of $100,000 and the method of payment to be negotiated during the Operational Permit Phase." (R. 726.)

F.    Art. 14: Sound Level Limits and Study

Article 14, § 8 also contains specific sound standards for wind projects. The applicant must demonstrate that the project will comply with a number of specific audible and low frequency sound level limits through a sound study conducted by a qualified professional approved by the Planning Board. (R. 1829, 1831.) The purpose of the study is to estimate the background sound before development and the predicted background sound after development. (R. 1829.) Article 14 fourteen includes an appendix with specific guidelines for developing a measurement of an area's pre-construction sound environment (R. 1837-45), which include narrative descriptions and iso-contour maps (R. 1839, 1841).

Of particular relevance to the following discussion are the standards for and measurement of low frequency sound levels. The CLUO requires the applicant to 1) measure the existing sound limits on the proposed site, the "pre" values; and 2) calculate post-construction values on the proposed site, the "post" values, in accordance with the CLUO mandated procedures. (R. 1831, 1837-42.) The "pre" and "post" sound levels must be measured or calculated using two different weighting systems: A-weighted sound level (dBA) and C-weighted sound level (dBC). (R. 1839.) The dBA "measure is designed to reflect the response of the human ear," and does not give as much weight to low frequency sounds, whereas the dBC measure "does not deemphasize low frequencies" to the same extent, resulting in a more accurate measure for sounds with a significant low frequency component. (R. 1821.)

8

The measured or calculated sound levels in dBA and dBC are given three different values: Leq, L10, and L90. "L90 is the value for the quietest continuous minute of a continuous ten minute period, L10 is the value for the loudest continuous minute of a continuous ten minute period, and Leq is the average value over the entire ten minute period." (R. 1839.) To distinguish the values from one another, the values are denoted with an "A" or "C" and (pre) or (post). "For example, L10A(pre) means the A-weighted preconstruction measurement of L10." (R. 1839.)

Based on these measurements or calculations, the ordinance limits sound based on whether the sound levels are audible or low frequency, and whether the sound level is measured within 4,000 feet or 4,000 feet or beyond of a turbine:

|  | Within 4,000 feet | 4,000 feet and beyond |
|---|---|---|
| **Audible sound limits:** | LeqA(post) may not exceed 45 dBA at night (7:00 p.m. to 7:00 a.m.) or 55 dBA during the day (7:00 a.m. to 7:00 p.m.) | LeqA(post) may not exceed pre-construction audible sound levels, LeqA(pre), by more than 10 dBA or a maximum of 40 dBA at night and 50 dBA during the day |
| **Low frequency sound limits:** | LeqC(post) minus LeqA(post) must be less than 20 dB outside of any occupied structure; L90C(post) may not exceed 50 dBC without contribution from other ambient sounds for properties 1 mi. away or more from Routes 9 or 180, and may not exceed 55dBC for properties closer than 1 mi. from Routes 9 or 180 | LeqC(post) minus LeqA (post) must be less than 20 dB outside of any occupied structure; L90C(post) may not exceed 50 dBC without contribution from other ambient sounds for properties 1 mi. away or more from Routes 9 or 180, and may not exceed 55dBC for properties closer than 1 mi. from Routes 9 or 180 |

(R. 1831-32.) Further, any audible sound level measurement must include a "5 dB penalty" when certain tones, as defined in the most current version of the IEC 61400-11, are present. (R. 1831-32.) The CLUO also provides that when one of the enumerated standards conflicts with another standard, "the most stringent requirements shall apply." (R. 1837.)

9

Pisgah submitted a pre-development ambient sound study prepared by a qualified professional consultant, Resource Systems Engineering (RSE). (R. 1015.) RSE's accompanying report compared the existing, pre-construction sound levels with the predicted, post-construction sound levels estimated. (R. 439.) The study included 17 receiver points (R1 through R17) that were selected to represent the nearest protected locations in eight compass directions at 4,000 feet and 1.5 miles from the nearest wind turbine. (R. 447.) Table 6-2 of RSE's report shows these receiver points, their distances from the proposed wind turbines, and the estimated hourly sound levels, both LeqA(post) and LeqC(post), from the wind turbines at each receiver point. (R. 455-56.)

The Planning Board selected David Hessler of Hessler & Associates as its independent, qualified consultant to review the RSE study, which he did in a letter dated March 24, 2011. (R. 711, 1216-1221.) Hessler, although stating that the CLUO's low frequency sound limits were impossible to measure and satisfy, concluded that RSE's study was "exhaustive, of very high quality and contains no significant errors or deficiencies" and agreed with RSE's conclusion that the project would comply with the CLUO, "under all normal circumstances." (R. 1219, 1221.)

The Beckfords submitted an alternative review of the RSE study by Stephen Ambrose of Ambrose Associates and Robert Rand of Rand Acoustics; Ambrose's review expressed doubt as to whether the RSE study complied with the applicable CLUO provisions. (R. 1015, 1190-1207.) Hessler reviewed the Beckfords' alternative review and concluded that it "contained significant flaws and represented a predisposed bias opposing the project." (R. 1015, 1160-66.) The Planning Board ultimately concluded that the application met the CLUO's sound limit requirements. (R. 724, 1015, 1020, 1023, 1031.) In doing so, the Planning Board relied on Hessler's opinion that the study "exceeded development standards and that the

10

submissions for the proposed project indicated compliance with the CLUO sound standards in Article 14 SPS 8.0," and comments from the MDEP approval in which its consultant stated RSE's study was "reasonable and technically correct according to standard engineering practices." (R. 715.)

III.    80B APPELLATE PROCESS

The Beckfords appealed the Board of Appeal's decision by filing a petition for review in Penobscot County Superior Court on March 15, 2012.   Upon a motion to dismiss by Respondent, the Court (*Anderson, J.*) concluded that the Beckfords' appeal was timely and allowed them 10 additional days to file a proper return of service.   The Court also granted Pisgah's limited motion to intervene in the proceeding.   The case was approved for transfer to the Business and Consumer Court on October 22, 2012.

The Court heard oral argument in Bangor on February 12, 2013.   Based on the presentations of counsel, and the issues raised about the low frequency sound limits, the Court permitted the parties to submit letters identifying record evidence that showed that the law frequency sound limits exceeded the proscribed limit outside of an occupied structure.

## DISCUSSION

I.    STANDARD OF REVIEW

In a Rule 80B appeal, the Superior Court to reviews findings made by the municipal decision maker to determine whether those findings were based upon an "erroneous interpretation of the law" or based upon conclusions of fact not "supported by substantial evidence on the record as a whole." *Bruk v. Town of Georgetown*, 436 A.2d 894, 897 (Me. 1981). "Substantial evidence is 'evidence that a reasonable mind would accept as sufficient to support a conclusion.'" *York v. Town of Ogunquit*, 2001 ME 53, ¶ 6, 769 A.2d 172 (quoting *Sproul v. Town of Boothbay Harbor*, 2000 ME 30, ¶ 8, 746 A.2d 368.) Because the Board of Appeals acted

11

solely in an appellate capacity,[4] the Court reviews the findings and conclusions of the Planning Board. *See Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶ 16, 868 A.2d 161. The Court "must affirm the decision of the [Planning Board], unless that decision was unlawful, arbitrary, capricious, or unreasonable." *Driscoll v. Gheewalla*, 441 A.2d 1023, 1026 (Me. 1982). The party seeking to overturn the decision bears the burden of persuasion on appeal. *Sawyer Envtl. Recovery Facilities, Inc. v. Town of Hampden*, 2000 ME 179, ¶ 13, 760 A.2d 257.

II.   ANALYSIS

On appeal, the Beckfords raise several grounds for challenging the Planning Board's decision to approve Pisgah's site plan application. The Beckfords contend that the Planning Board erred in its interpretation of "Occupied Structure," resulting in the project violating the setback requirements for turbines. The Beckfords further contend that the evidence was insufficient to support the Planning Board's findings that (1) the decommissioning bond is adequate to meet the entire cost of decommissioning and site restoration; (2) Pisgah has demonstrated financial capability to do the project; and (3) Pisgah's EIS was adequate. In addition, the Beckfords challenge the CLUO as unconstitutional for overly vague criteria regarding wind turbine height standards. Finally, the Beckfords challenge the sufficiency of the evidence that the RSE study and project satisfied the CLUO's sound limits and assert the Planning Board erred by accepting a sound study that failed to (1) apply the required 5db tonal penalty, (2) produce iso-contour maps that to record pre-construction sound, and (3) record a narrative of sounds in the preconstruction sound calculation.

In addition, the Town has raised the threshold issue of the Beckfords' standing to bring this appeal, which the Court briefly addresses first. To qualify as a party, one must

---

[4] The CLUO authorizes the Board of Appeals to "hear and decide administrative appeals, on an appellate basis, where it is alleged by an aggrieved party that there is an error in any order, requirement, decision, or determination made by, or failure to act by, the Planning Board in the administration of this Ordinance." (R. 1868.)

(1) participate before the Planning Board, and (2) show a particularized injury as a result of the Planning Board's action. *See Nergaard v. Town of Westport Island*, 2009 ME 56, ¶ 18, 943 A.2d 735; *Forester v. City of Westbrook*, 604 A.2d 31, 32 (Me. 1992). Parties appealing as abutting land owners "need only allege a potential for particularized injury to satisfy the standing requirement." *Sproul*, 2000 ME 30, ¶ 6, 746 A.2d 368. The Planning Board recognized Peter Beckford as an interested party on September 21, 2011. (R. 712, 93.) Moreover, the proximity of the Beckfords' property to the wind project site more than qualifies them as persons to whom the project could cause "adverse consequence[s] affecting the party's property, pecuniary or personal rights." *Id.* ¶ 7. Thus, the Court concludes the Beckfords have standing to bring this appeal.

A.    The Setback Requirements

The Beckfords first contend that the Planning Board erred in determining their cabins are not "Occupied Structures" as defined in the ordinance. The CLUO defines an "occupied structure" as "a building in which people, live, work or frequent." (R. 1822.) Because the site of the proposed wind project puts wind turbines within 4,000 feet of two cabins on their property the Beckfords argue that the plan approval violates the setback requirement that each wind turbine be "4,000 feet from any residence, business, school, daycare facility, church, hospital or other Occupied Structure on any Non-Participating Parcel." (R. 1833.) The Beckfords assert that they use their cabins "frequently, for rest, work, as a destination for walks, runs and snowshoe hikes, and for a calm retreat"—uses, they assert "fit squarely into the definition of a building in which people live, work, and frequent." (Pet. Br. 9-10.) They assert the "plain language of the CLUO does not allow for an interpretation of the term 'occupied structure' to require plumbing or running water." (Pet. Br. 9.) Thus, they conclude, Pisgah was required to

13

"reconfigure its project to take into account the 4,000-foot setback" from these two cabins. (Pet. Br. 10.)

The Planning Board found that neither cabin fit within the definition of "occupied structure." (R. 1021.) Specifically, the Planning Board interpreted "occupied structure" to mean a building fit for occupancy, one that has "facilities for plumbing, sanitation and water supply," a characteristic the Planning Board found common to the other structures listed in the setback provision such as a residence, business, or school. (R. 717, 1022.) The Planning Board found that neither of the Beckfords' cabins had such facilities and noted that the permit for the second cabin "expressly prohibits use of the building as a full-time residential structure or for rental purposes." (R. 716-17, 1021-22.)

Typically, a planning board's characterization of a structure is a finding of fact, and courts give deference to that ultimate conclusion. *See Jordan v. City of Ellsworth*, 2003 ME 82, ¶ 8, 828 A.2d 768. Moreover, the terms of a zoning ordinance "are to be construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole." *Peregrine Developers, LLC v. Town of Orono*, 2004 ME 95, ¶ 9, 854 A.2d 216. The party challenging a board's factual determination has the burden of demonstrating that the evidence compels a contrary conclusion. *See Bruk*, 436 A.2d at 899.

Both parties raise several arguments about the timing and motivation behind the Beckfords' construction of their cabins. Without deciding or addressing those issues, the Court concludes that the Planning Board's interpretation of the ordinance was reasonable and that it supported its determination that the cabins were not occupied structures with a thorough explanation based on substantial record evidence. The Planning Board found that neither cabin was equipped with the necessary facilities for occupancy. Notably, the building permit for the second cabin, "expressly prohibits use of the building as a full-time residential structure or for

14

rental purposes," and the description of the proposed structure in the Beckford's permit application stated the building would not have "plumbing or electric." (R. 1021, 1053-1061.) The Board's interpretation of "occupied structure" is reasonable and the record supports the factual determination that neither cabin met that definition.

### B.      The $100,000 Decommissioning Bond

Next, the Beckfords contend that the Planning Board erred in determining that the value of the decommissioning bond, i.e. $100,000, would be enough to restore the site because the evidence submitted by Pisgah does not support that conclusion. (Pet. Br. 25.) They assert that Pisgah submitted only a quote for demolition and foundation removal, and excluded other relevant items. (Pet. Br. 25.) They further contend that Pisgah failed to provide an estimate from a qualified professional that would cover this specific wind project. (Pet. Br. 25.) Thus, the Beckfords contend, the Planning Board was without enough information to calculate a proper cost for decommissioning.

In its application, Pisgah provided a decommissioning plan that described the anticipated life of the wind turbine to be twenty years and also described the decommissioning process, which included the removal of above-ground structures, below ground structures, grading, if necessary, and topsoil and seeding restoration. (R. 42-45.) The study also included a cost estimate of decommissioning representing the costs of project management, site reclamation, turbine foundations, electrical collection system, substation, and transmission line. (R. 42-43.) Pisgah offset the cost of decommissioning with the salvage value of the project components, resulting in an unmet balance of just under $100,000. (R. 43.) The Planning Board reviewed the plan and found it to be an adequate and reasonable study. (R. 1019.) It also conditioned its approval of the site plan on Pisgah providing a $100,000 decommissioning bond. There was conflicting evidence regarding the scrap value of the turbines themselves (R.

15

430), but the Court cannot say that the Planning Board's finding that the decommissioning bond is adequate for decommissioning and site restoration is unsupported by substantial evidence in the record. *See Bruk*, 436 A.2d at 899.

C.    Pisgah's Financial Capability

The Beckfords argue the Planning Board did not support its finding that Pisgah demonstrated financial capability with substantial evidence. (Pet. Br. 26.) As part of its application, Pisgah submitted a letter of intent from Camden National Bank and a letter of commitment from Cianbro. (R. 714.) The letter from Camden National Bank expressed the bank's "interest in expeditiously providing up to $14,000,000 for the construction and permanent financing of the Pisgah Mountain wind farm project," and that it was "without all required underwriting data and the following is a non-binding proposal." (R. 245.) Likewise, the Cianbro letter represented "Cianbro's commitment to provide Construction Financing for the erecting and balance of plant costs with the Pisgah Mountain project," and that "[f]inancing w[ould] be subject to mutual agreeable terms and conditions . . . ." (R. 250.) Pisgah also included an estimated project budget, which included a contribution from Pisgah and a breakdown of costs with a total estimated cost of twenty million dollars. (R. 832.) The Planning Board reviewed the bank letters and the estimated budget and concluded that Pisgah demonstrated financial capacity to do the project. (R. 718.)

With respect to financial capacity, there are no specific requirements for wind projects. Rather, the general site plan review requirements in the CLUO simply requires:

> Documentation that the applicant has adequate financial resources to construct the proposed improvements. Evidence could include a letter from a financing institution regarding a loan, letter of credit, or bank account or a certified accountant or annual report indicating adequate cash flow to cover anticipated expenses. The applicant should document a semi-detailed budget estimate for all costs associated with the capital investment including: engineering, legal, financial and capital expenses and documentation on financing package available to cover the project expenses.

16

(R. 1713.) The lack of specificity in this provision may reflect the fact that it applies to more than just wind energy projects, as well as an assumption that the Planning Board will use its best judgment in determining what financial evidence is sufficient to show whether a developer has the financial capability to carry out a particular project.

The Town and Pisgah cite *Concerned Citizens to Save Roxbury v. Board of Environmental Protection*, 2011 ME 39, 15 A.2d. 1263, as a case in which the Law Court accepted non-binding proposals as sufficient evidence of a developer's financial capability to construct and operate a wind energy project subject to a state statute. (Resp. Br. 21.) In *Concerned Citizens to Save Roxbury*, the developer applied for a permit to construct a wind energy facility consisting of twenty-two wind turbines along a ridgeline in Roxbury. *Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶ 6, 15 A.2d. 1263. In addition to a non-binding proposal from a bank, the developer in that case submitted a commitment from its parent company stating its intent to fully finance the project as well as evidence showing the developer had sufficient funds to finance the project. *Id.* ¶ 28. The Law Court concluded this evidence to be substantial enough to support a finding that the developer had the financial capacity to do the project. *Id.*

The decision in *Concerned Citizens* supports the Beckfords' argument that the evidence in this case was not enough to support the Planning Board's finding regarding Pisgah's financial capacity more than it supports the position of the Town and Pisgah. In the present matter, the letters from both institutions were non-binding proposals to finance the project and were contingent on a financial analysis of the company. (R. 245, 250.) The financing institutions would still need to determine whether Pisgah has the wherewithal to put up the collateral and security for the loan.

In *Concerned Citizens*, the developer provided more solid evidence of its financial capacity than Pisgah has provided. Nevertheless, that project in that case was also much larger than

17

this one, and the statute at issue in that case was more stringent than the ordinance at hand in the present matter. Although this Court might well have decided that Pisgah did not adequately demonstrate financial capability to carry through with this project, the Court is not permitted to substitute its own judgment for the Planning Board's judgment merely because it disagrees with it or because it would have weighed the evidence differently. *York*, 2001 ME 53, ¶ 6, 769 A.2d 172. Thus, the Court concludes that the Planning Board supported its finding that Pisgah demonstrated financial capability with substantial evidence.

D.    The Environmental Impact Statement

The Beckfords argue that the Planning Board erred in concluding the project would have no adverse environmental impact because this finding was based on an "inadequate" Environmental Impact Statement that "failed to address all relevant issues," as it was required to do pursuant to the CLUO. (Pet. Br. 31.) Specifically, the Beckfords argue that Pisgah failed to adequately address twenty different criteria as it was required to do for the Planning Board to determine the potential environmental impacts of the proposed project. (Pet. Br. 30.) Instead, the Beckfords argue, Pisgah submitted a "cursory environmental impact statement" consisting of letters from the Maine Department of Inland Fisheries and Wildlife and the Maine Department of Conservation. (Pet. Br. 31.) The Beckfords assert these letters merely reflected the fact that both departments lacked data as to whether the project site was home to essential habitats or rare species, and that further investigation was required before a definitive statement could be made about the presence or absence of unusual natural features at the site. (Pet. Br. 31.) Thus, they conclude, the Planning Board had insufficient evidence when it determined the project would not adversely impact the environment. (Pet. Br. 31.) The Town and Pisgah argue the application met all the ordinance requirements and that the Planning

18

Board's decision not to require a more detailed statement was supported by substantial evidence. (Resp. Br. 23.)

The CLUO requires the Planning Board to determine "that the proposed project will not cause undue environmental harm," and that "[w]hen requested by the Planning Board the applicant shall provide a written Environmental Impact Statement . . . in sufficient detail for the [Planning Board] to ascertain what the potential impact of the project may be on the development and on adjoining land . . . ." (R. 1713.) The CLUO includes a comprehensive list of 20 environmental factors that must be addressed by the impact statement. (R. 1714-15.)

In its application, Pisgah addressed all of the 20 factors in the CLUO and submitted the previously mentioned letters. (R. 27-28.) It also submitted a comprehensive Stormwater Management Plan with its application, which included information about soil at the site and professionally prepared plans for erosion and sediment management. (R. 283-432.) The Planning Board reviewed the letters, the responses to each of the twenty criteria, and an approval from the MDEP and found that for most of the criteria, the project would have little or no impact. (R. 715, 719-20, 1012-14.) The Planning Board also concluded mitigating actions would offset any adverse impact. (R. 1014.) Based on the record, the evidence is of competent character that a "reasonable mind" could accept "as adequate to support the conclusion drawn by the Planning Board." *Bruk*, 436 A.2d at 899. The Court, therefore, concludes that the Planning Board's finding is supported by substantial evidence on the record.

E.     Turbine Height Standard

The Beckfords argue the CLUO is unconstitutionally vague because it lacks specific standards regarding tower height for wind energy projects. (Pet. Br. 27.) Specifically, they assert that the only guidance applicable to tower height provides that "unoccupied structures with height exceeding 35 feet will be subject to height restrictions as determined by the

19

[Planning B]oard to be appropriate and necessary for the proposed use." (R. 1794.) This, the Beckfords contend, does not provide an "objectively quantifiable criteria" to allow the Planning Board to reasonably calculate an appropriate wind turbine height. (Pet. Br. 28.) The Town and Pisgah argue that the standard provides the Planning Board with "sufficient parameters" to determine height restrictions that are appropriate for the proposed use, and that the CLUO is "far removed" from the type of ordinance language the Law Court has held to be unconstitutionally vague. (Resp. Br. 24.)[5]

A zoning ordinance is unconstitutionally vague if it provides no standards by which to examine an application or, relatedly, if it gives the decision maker unfettered discretion. For example, in *Waterville Hotel Corp. v. Board of Zoning Appeals*, the Law Court held that a zoning ordinance that only instructed the Board to exercise its power "in harmony with the comprehensive plan for municipal development and the purpose and intent of this ordinance, in accordance with the public interest and in support and furtherance of the health, safety and general welfare of the residents of the municipality," was too general and did not provide sufficient guidance to meet constitutional requirements. 241 A.2d 50, 53 (Me. 1968). Standards are necessary not only to inform applicants about the requirements they must meet, but also to prevent favoritism and discrimination. *See id.* While "the exercise of discretion and judgment is to a certain extent necessary for the proper administration of zoning ordinances," the legislative body needs to provide "some standard or basis . . . by which such discretion and judgment may be exercised by the board." *Id.* at 52. A zoning ordinance that is "vague and

---

[5] The Town also asserts that the Beckfords waived their constitutional arguments by not raising them in the appeal to the CZBA. (Resp. Br. 27.) A party to an administrative proceeding must raise an issue before that body in order to preserve the issue for appeal. *See Berry v. Bd. of Trustees, Me. State Ret. Sys.*, 663 A.2d 14, 18 (Me. 1995). An issue is considered raised and preserved for appeal "if there is sufficient basis in the record to alert the court and any opposing party to the existence of that issue." *Farley v. Town of Washburn*, 1997 ME 218, ¶ 5, 704 A.2d 347.

The record reveals the Beckfords did raise two constitutional issues on appeal to the Board of Appeals and the Board of Appeals determined it did not have jurisdiction to address them. (R. 1657; A. tab 1 at 1.) The Beckfords' objections were sufficient to alert the Town to their existence, and the Beckfords did not waive these issues.

indefinite cannot be sustained as valid under the authorizing act." *Id.* Likewise, in *Cope v. Inhabitants of Town of Brunswick*, the Law Court held an ordinance that left it to the Board to determine whether a proposed use would "adversely affect the health, safety or general welfare of the public," and whether the use would "alter the essential characteristics of the surrounding property," improperly delegated legislative authority to the Board and was therefore void." 464 A.2d 223, 225 (Me. 1983).

The ordinance provision at issue does not allow the Planning Board to make its decision on height restriction "based on any factor they independently deem□ appropriate." *Uliano v. Bd. of Envtl. Prot.*, 2009 ME 89, ¶ 25, 977 A.2d 400 (quotation marks omitted)." Rather, the ordinance states that the height restriction must be "appropriate and necessary for the proposed use." (R. 1794.) This standard requires the Planning Board to examine the proposed use of a parcel of land and determine what height standards are necessary and appropriate for that use. The Planning Board also must determine whether the height of the proposed structure is accordingly appropriate and necessary, consistent with the proposed use. The Beckfords do not argue that the ordinance conflicts with State standards or that the State has imposed a limitation upon the town to make any height ordinance. The ordinance that the Town did enact allows the Planning Board to use its best judgment, consistent with the proposed use of a parcel and unoccupied structure, to determine what is permissible on a case-by-case basis, covering a multitude of situations not presently before the Court. The exercise of that judgment does not render the ordinance unconstitutionally vague in any situation.

Nevertheless, the Court does find peculiar the fact that the CLUO standards specific to wind energy facilities lack a provision on tower height. The record reflects that the wind turbines selected by Pisgah stand about 455-feet tall to the top of the blade. (R. 30, 1156.) Moreover, the Planning Board did not make specific findings regarding the height of the

21

Pisgah turbines or how they met the standards of the CLUO, although the Beckfords have not raised this issue. The only reference to turbine height in the decision is in noting that turbine height was an argument made by citizens opposing the project. (R. 714.) There is a compelling argument to be made that the "appropriate and necessary" standard in the CLUO height provision may be sufficient for some structures, but is not sufficient for structures of extraordinary height, such as a wind turbine taller than one and a half football fields. The absence in the record of any evidence as to how the Planning Board decided that the height of the approved turbines was appropriate and necessary leads the Court to withhold final ruling on the constitutionality of the CLUO height provision until after the Planning Board has revisited the issue on remand.

F.      Sound Level Limits and Study

Finally, the Beckfords raise multiple contentions against the Planning Board's findings regarding the sound study and sound standards. First, they assert that Pisgah's own sound level assessment reveals the predicted low frequency sound levels exceeded the permitted sound limits, and the Planning Board accordingly exceeded its authority by approving the application. (Reply Br. 3.) The Beckfords further contend that the RSE study is insufficient because it: 1) applied an incorrect tonal penalty, which is the MDEP standard, rather than the more stringent 5dB tonal penalty required by the CLUO (Pet. Br. 18.); 2) did not provide iso-contour maps, which are required elements for a reliable measurement of the pre-construction sound (Pet. Brief 19.); and 3) failed to provide narratives, describing the background sounds that took place while the engineer took pre-construction measurements (Pet. Br. 22). The Beckfords contend the Planning Board never addressed these deficiencies, and, therefore should not have approved the application. (Pet. Br. 12.) Moreover, they assert that the Planning Board did not waive these submission requirements, nor could it have done so because an

22

industrial wind project does not meet the standard for such a waiver. (Pet. Br. 6.) The Town and Pisgah argue that the application met all the ordinance requirements, and, therefore, the Planning Board properly granted the application approval. (Resp. Br. 6.)

Upon reading the record, it is not clear how the Planning Board determined the application complied with the low frequency sound levels. The fundamental problem is that the arithmetic supports the Beckfords' contention that the low frequency levels exceeded the CLUO limits. The CLUO provides that at 4,000 feet and beyond a wind turbine, the low frequency sound levels, LeqC (post) minus LeqA (post), "must be less than 20 dB outside of any occupied structure . . . ." (R. 1832.) The same standard applies for areas within 4,000 feet of a wind turbine. (R. 1832.) These provisions are specific, determinate and are indeed non-waivable; the Planning Board has no room for discretion. (*See* R. 1831 ("Site plan approval . . . shall be denied if the [Planning] Board determines that the wind energy facility will not meet [the sound] standards.").)

Specifically, RSE's own study shows the low frequency standards were larger than those permitted in the ordinance. Table 6-2 of the RSE study shows the estimated sound levels for both LeqA(post) and LeqC(post) at seventeen different receiver points. (R. 456.) The Beckfords point out that in comparing the two figures (LeqC(post) minus LeqA(post)),[6] one can calculate that the estimated low frequency sound levels exceed the 20 dB low frequency limits at five different receiver positions: R2, R4, R12, R14, and R16. (R. 456.) The Beckfords point to the Area Ownership Map and the Sound Model Prediction Map as evidence that there are occupied structures within those areas where the low frequency levels exceed the ordinance standards. (Beckford letter to BCD dated Feb. 20, 2013.) They argue that one receiver point,

---

[6] With respect to low frequency sound limits, the CLUO states: " LeqC(post) minus LeqA(post) must be less than 20 dB outside of any occupied structure." (R. 1831, 1832.)

R14, is at Lower Springy Pond, a location near several permanent and seasonal residences along Springy Pond Road.[7] (R. 448.)

The Town and Pisgah contend that the estimates in Table 6-2 were "generated from highly conservative assumptions that drastically, and deliberately, overstated the actual amount of sound that would be generated, including low frequency." (Resp. Br. 6.) This response in effect suggests that the result should be ignored. It does not suffice. It is the applicant's burden to produce specific evidence demonstrating compliance, and if the non-compliant sound results are ignored as the Town and Pisgah suggest, the burden has not been met.

The town's consultant reviewed the report, determined that it was of "professional quality" and that it would comply with the requirements "under all normal circumstances." (A. tab 6 at 4 of 5.) Nevertheless, the fact that the study was of professional quality does not support the conclusion that it satisfied the "required elements" of the CLUO. Hessler advised the Planning Board that the project would not meet the low frequency limits. (R. 1219, 1164.) He opined it would not be possible to accurately measure for them. (R. 1219.)

It is also unclear how the Planning Board concluded the RSE study met all applicable requirements when the RSE study did not include the narratives, did not include the iso-maps, and applied the MDEP tonal penalty rather than the CLUO tonal penalty. The CLUO provides that any audible sound level measurement must include a "5 dB penalty" when certain tones, as defined in the most current version of the IEC 61400-11, are present. (R. 1831-32.) The CLUO also calls for "iso-contour maps" showing the pre-construction and post-construction audible and low frequency sound levels. (R. 1839, 1841-42.) In his response to the Ambrose critic that the RSE study did not produce iso-contour maps, Hessler stated, "it is impossible to produce such a map." (R. 1160.) Given that iso-contour maps are a specific

---

[7] The Town has not disputed the Beckfords' assertion that there are occupied structures near Springy Pond, and the RSE study and maps showing lot lines in the record strongly suggest that to be the case.

requirement of the CLUO, an applicant that is unable to produce such maps has not demonstrated compliance with the ordinance.

Similarly, the record before the Court does not explain why the Planning Board accepted application of the MDEP tonal penalty. The RSE engineers commented on the confusion they had with the tonal penalty and stated they used the DEP standard absent further clarification from the Board. (R. 444.)

Other than its conclusory statements that the "applicant's submitted evidence satisfied each sound standard element" and the "pre-development ambient sound study . . . indicat[ed] development compliance with the sound generation standards listed in SPS 8.0," the Planning Board decision does not explain how it ultimately determined the application complied with the ordinance. (R. 715.) The Planning Board did not address the fact that RSE did not include narratives or the iso-maps in its study. Nor did it discuss the fact that RSE applied the MDEP tonal penalty. Instead, the Planning Board simply recited Hessler's opinion that the project would comply with the ordinance "under all normal circumstances." (A. tab 6 at 4 of 5.) Such a conclusory statement absent factual explanation does not permit "meaningful judicial review." *Harrington v. Inhabitants of Town of Kennebunk*, 459 A.2d 557, 561 62 (Me. 1983).

While the CLUO permits the Planning Board to obtain assistance from a sound consultant such as Hessler (R. 1829), the Planning Board still had to examine the evidence and state how and why it determined that the requirements were met. This is particularly true when the basis for its findings is "not obvious or easily inferred from the record." *See Christian Fellowship & Renewal Ctr. v. Town of Limington*, 2001 ME 16, ¶ 10, 769 A.2d 834. Hessler did not state the project would comply with the CLUO requirements for low frequency sound levels. The Planning Board made no findings as to whether the study included iso-maps and narratives and whether the RSE engineer applied the 5dB penalty as required by the CLUO.

25

The Town argues that these requirements may be waived "if the Planning Board determines it is unnecessary to assess whether the LUO's sound standards will be satisfied." (Resp. Br. 10.) The Planning Board, however, did not waive that requirement in writing. In fact, it stated that the iso-contour maps would be required when the issue came up at the April 6, 2011, hearing. (R. 1349.) It is also not clear that the CLUO requirements at issue can be waived even if a waiver had been requested.

The Planning Board has, therefore, not provided the basis for its conclusion that the application complied with the sound level standards and the study requirements. These "insufficient findings do not allow a reviewing court to determine whether the Planning Board's decision is supported by substantial evidence," *Christian Fellowship & Renewal Ctr.*, 2001 ME ¶ 10, 769 A.2d 834, as opposed to "a rubber-stamp approach for the courts based on speculation and clairvoyance or, alternatively, judicial usurpation of the administrative function," *Harrington*, 459 A.2d at 562. Because the findings do not allow for meaningful judicial review on this issue, the Court must remand the matter back to the Planning Board for further factual findings.

## *CONCLUSION*

Based on the foregoing analysis, the Court ORDERS:

1. The decision of the Planning Board is AFFIRMED with respect to the interpretation of occupied structure and evidence of compliance with the financial capability, environmental impact, and decommissioning requirements of the CLUO.

2. The Court REMANDS the matter to the Board of Appeals with instructions to remand to the Planning Board for reconsideration and for further factual findings regarding the following issues:

    (a) whether the proposed height of the turbine structures meets the height standards of the CLUO; and

    (b) whether the applicant has demonstrated compliance with the sound standards of the CLUO.

26

3.    On remand, the Planning Board may entertain further argument from any party but may not receive additional evidence into the record.   The Planning Board's reconsideration and further findings are to be based on the existing record.   On remand, the Planning Board may or may not amend or alter its decision on any issue, but shall in any case make findings on the height and sound standard issues.

4.    The Court retains jurisdiction over this matter pending the additional findings by the Planning Board.

Pursuant to M.R. Civ. P. 79(a), the clerk is instructed to incorporate this order into the docket by reference.

Date:   8 May 2013

A.M. Horton
Business and Consumer Court

27

BCD-AP-12-10

Peter Beckford and Julie Beckford (Petitioners) v. Town of Clifton (Respondent) and Pisgah Mountain, LLC (Intervenor)

Counsel for Petitioners:

Eric M. Mehnert, Esq
Cynthia Mehnert, Esq
Hawkes & Mehnert
Six State Street, Suite 600
Bangor, Maine 04401

Counsel for Respondent:

David F. Szewczyk, Esq
David F. Szewczyk Attorney at Law
One Cumberland Place, Suite 314
Bangor, Maine 04401

Counsel for Intervenor:

William B. Devoe, Esq
Jonathan A. Pottle, Esq
Eaton Peabody
80 Exchange Street
P.O. Box 1210
Bangor, Maine 04402-1210

STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-AP-12-010

AMH - CUM - 12/10/2013

PETER BECKFORD and JULIE
BECKFORD,

                Petitioners,

    v.

TOWN OF CLIFTON,

                Respondent,

and

PISGAH MOUNTAIN, LLC

                Intervenor

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

### *DECISION AND ORDER AFTER REMAND*

This case is again before the court, following remand to the Town of Clifton Planning Board (Planning Board) for further consideration of Intervenor Pisgah Mountain, LLC's (Pisgah) site plan application to construct and operate a wind energy project in Clifton.

For the reasons, set forth below, the court grants the appeal of Peter and Julie Beckford and vacates the approval of Pisgah's industrial wind energy project.

### *Background*

This court's May 8, 2013, Decision and Order summarized the pertinent aspects of Pisgah's proposed project and the procedural path of Pisgah's application for approval pursuant to the Town of Clifton Land Use Ordinance (CLUO), culminating in the appeal of Peter and Julie Beckford (the Beckfords) pursuant to M.R. Civ. P. 80B to this court. The May 8, 2013, Decision and Order is hereby incorporated by reference in the present order.

1

In the May 8, 2013 Order, the court affirmed the Planning Board's approval of Pisgah's project in some respects, but remanded the matter to the Planning Board for consideration of two issues: "(a) whether the proposed height of the turbine structures meets the height standards of the CLUO; and (b) whether the applicant has demonstrated compliance with the sound standards of the CLUO." *Beckford v. Town of Clifton*, BCD-AP-12-10, at 26 (Bus. & Consumer Ct. May 8, 2013). To facilitate further review and avoid delay, the court limited the Planning Board's reconsideration of those issues to the existing evidentiary record, but permitted the Board to entertain argument, based on the existing record, from the parties. *Id.* at 27. The Planning Board held a meeting and heard argument from the parties on July 18, 2013, and held workshops on August 13 and 14, 2013. After the second workshop, the Planning Board issued additional findings that have been submitted to the court, along with briefs from the parties regarding the additional findings. The court heard oral argument November 6, 2013, and took the case under advisement.

## *Analysis*

The applicable standard of review and other aspects of the legal framework that governs the analysis are set forth in the May 8, 2013, Decision and Order in this case, and need not be restated here.

A.    *Height of the Turbine Structures*

Because this order sets aside the Town's approval of Pisgah's project on other grounds, the turbine height issue need not be discussed in detail. However, assuming, but not deciding, that the CLUO height standard is valid as applied to Pisgah's proposed turbine structures,[1] the

---

[1] Despite the detailed standards of Article 14 of the CLUO for wind energy projects such as the one proposed by Pisgah, including the requirement of a visual impact study of a proposed project's effects on the ridgeline and scenic views (R. 1830-31), the CLUO has no height standards for wind turbines specifically. Instead, wind turbines are subject to the CLUO's generic standard applicable to all "unoccupied structures with height exceeding 35 feet." (R. 1794.) The CLUO provides simply that such

2

court deems the Planning Board's additional findings sufficient to support the Planning Board's decision to approve the height of the structures.

B.    *The Planning Board's Decision to Waive Submittal of Iso-Contour Maps Depicting Pre-Construction Sound Levels as Part of the Applicant's Pre-Construction Sound Study*

The court's Decision and Order remanding the matter with respect to the sound requirements of the CLUO encompassed several issues relating to the sound standards and submittal requirements of the CLUO, all of which the Planning Board purported to address in its additional findings.

The only sound issue that needs to be discussed in detail here relates to the clear CLUO requirement that an application for approval of a wind energy facility incorporate what the CLUO refers to as a "pre-construction sound study." The stated purposes of the pre-construction sound study are "first, to establish a consistent and scientifically sound procedure for evaluating existing background levels of audible and low frequency sound; and, second, to determine whether the proposed wind energy facility will meet the [sound limits of the CLUO]." (R. 1839.)

The pre-construction sound study is to include specific components, including iso-contour maps. (*See* R.1831-32 (sound standards); R. 1840-41 (iso-contour maps required as part of the pre-construction sound study).) The CLUO is specific in requiring that the pre-construction sound study include iso-contour maps showing calculated levels of both "pre-construction background sound" and "post-construction sound." (R. 1841.) The plain purpose of requiring the pre-construction sound study to include projections of pre- and post-

---

structures "will be subject to height restrictions as determined by the [Planning B]oard to be appropriate and necessary for the proposed use." (R. 1794.)

The absence of detailed guidelines or even a list of factors to be considered for wind turbines hundreds of feet tall does raise a question as to whether the generic "appropriate and necessary" standard is a sufficient limitation on the Planning Board's discretion. *See Wakelin v. Town of Yarmouth,* 523 A.2d 575, 577 (Me. 1987). *But cf. Town of Baldwin v. Carter,* 2000 ME 106, ¶¶ 12-14, 794 A.2d 62.

construction sound levels is to enable the projected sound impact of the proposed facility to be assessed in light of the CLUO sound limits.

Pisgah's pre-construction sound study did not include iso-contour maps depicting pre-construction background sound levels. (R. 448-49, 764.) It did include iso-contour maps depicting projected post-construction sound levels. (R. 795-802.) In its initial decision, the Planning Board approved Pisgah's application without explaining how the application could be approved in the absence of the required iso-contour maps depicting pre-construction background sound levels. The court's remand included a request that the Planning Board consider whether Pisgah could be granted approval without submitting iso-contour maps with its pre-construction sound study.

The court's May 8, 2013, Decision and Order noted that no waiver of the pre-construction iso-contour map requirement had been granted, and it also questioned whether a waiver even could be granted. The court assumed and expected that the Planning Board would review the waiver provision of the CLUO, and then decide whether a waiver could, and should be granted.

In response, the Planning Board in its additional findings granted a waiver of the iso-contour map requirement. Specifically, the Planning Board found:

> In the Record at 0139, the Planning Board's recollection is that the request was made to not perform a sound study at all prior to development of the project. The Planning Board intended for the developer to produce post-construction iso-contour maps. In the Record at 01153, the Planning Board voted that the applicant submit 8 iso-contour maps for the 4 seasons. The intent was for the applicant to produce post-construction iso-contour maps. Had the Planning Board intended t have the applicant submit pre-ambient iso-contour maps, the request would have been for 16 maps. *See Record at 01841, paragraphs 6 and 7.*
>
> Pre-construction background sound iso-contour maps were discussed exhaustively by the Planning Board. Town consultant Hessler indicated that it would be impossible to produce such a map. *Record at 1161.*

4

The iso-contour map of predicted post-construction sound is based on specific sources. A map of ambient sound contours would literally change every second, and is not useful for determining compliance with the CLUO.

Based on competent engineering and scientific authority, the requirement was impossible to produce, and, since the information was not required to determine compliance with the standards of the ordinance, the Planning Board waives the requirement for pre-construction background sound iso-contour maps under Article 6, Section 3(H), p. 6-8 of the CLUO (*Record at 01715*).

(Town of Clifton Planning Board Additional Findings 4, § 5.)

Because the Planning Board's Additional Findings do not quote from the CLUO waiver provision or recite the standards for waiver, it is not clear whether, before granting a waiver, the Planning Board ever considered the underlying basic question of whether the cited Article 6, Section 3(H), p. 6-8 of the CLUO even authorizes a waiver of the requirement of iso-contour maps depicting pre-construction background sound levels. In any case, the court must now address that question.

Initially, it must be said that iso-contour maps are much more than a "technical submittal requirement" of the CLUO. In defining the requirements of the sound study that must be submitted as part of the application for approval of a wind energy facility, the CLUO provides that "*[a]t a minimum, the study shall include the following information,* and meet the following requirements" and then lists the required elements in twelve numbered paragraphs. (R. 1840 (emphasis added).) The importance of iso-contour maps is implied in the fact that five of the 12 required elements of the pre-construction sound study—those at paragraph 6 through 10 of the list—pertain to iso-contour maps. (R. 1840-41.)

The iso-contour maps serve a unique and specific purpose. The CLUO at Article 14, SPS 8.0, section G(1) provides that the sound limits it imposes "are to apply *everywhere* within four thousand feet (4,000 feet) of any wind turbine," and also "*everywhere* at a distance four thousand (4,000 feet) and over of any wind turbine." (R. 1831-32 (emphasis added).) However,

5

sound measurements obviously cannot be taken "everywhere," and instead are taken at "Measurement Points" located pursuant to the detailed sound study requirements set forth in the Appendix to Article 14 (SPS 8.0). (R. 1837.) The means by which pre-construction and post-construction sound levels are depicted at points "everywhere" around the proposed facility, based on extrapolations from the sound measurements taken, is through the iso-contour maps. The iso-contour maps required to be submitted as part of the sound study must "extend to a minimum of 1.5 miles beyond the perimeter of the project boundary, and may be extended to a distance of more than 1.5 miles at the discretion of the Planning Board." (R. 1841.)

The CLUO provides that a wind energy facility's audible post-construction sound levels at a distance of 4,000 feet or more from a turbine cannot "exceed pre-construction sound levels by more than 10dBA." (R. 1832.) Thus, it is only by comparing the iso-contour maps depicting pre-construction background levels with the maps depicting projected post-construction sound levels that it is possible to determine whether the proposed facility will comply with this sound limit "everywhere" between 4000 feet and the 1.5 mile radius required to be shown on the maps.

The record is replete with tables depicting measured background levels at specific receiver or measurement points, (R. 448 *et seq.*), but this court has not been pointed to, or itself been able to locate, any map or table or anything else in the record that graphically depicts pre-construction background sound levels "everywhere" within a radius of 1.5 miles of the project site, in the manner that the missing iso-contour maps would have done. In other words, the CLUO requirement of iso-contour maps depicting pre-construction background sound levels is no *de minimis* "technical submittal requirement", but instead is essential to enabling the Planning Board to fulfill its responsibility of determining whether the proposed project will comply with the sound limits of the CLUO beyond 4,000 feet from any turbine.

6

With that context established, the analysis turns to whether the CLUO authorizes the Planning Board to waive the requirement that the applicant's sound study include iso-contour maps depicting pre-construction background sound levels.

A planning board's authority to waive requirements of an ordinance is defined and limited by the waiver provisions of the ordinance. *See Bodack v. Town of Ogunquit,* 2006 ME 127, ¶¶ 14-15, 909 A.2d 620; *York v. Town of Ogunquit,* 2001 ME 53, ¶ 10, 769 A.2d 172; *Jarrett v. Town of Limington,* 571 A.2d 814, 814-15 (Me. 1990).

The waiver provision of the CLUO appears at Article 6, section 3(H), page 6-8 of the CLUO (R. 1715) and reads as follows:

H. Waivers of Submission Requirements

In cases where development or expansion *will not significantly change the nature or intensity of the use or exterior dimensions of any existing structure,* or where a proposed use is deemed by the Planning Board to *have no discernable impact on adjoining property or the environment or public infrastructure,* the Planning Board may waive the review procedure and all or portions of the submission requirements in order that the project may be expedited if the information is not required to determine compliance with the standards of this Ordinance.

(R. 1715 (emphasis added).)

On its face, the waiver provision does not apply to Pisgah's application at all. It plainly applies only to two categories of applications, both involving *de minimis* impact, and its stated purpose is to expedite such applications. One such category involves applications for projects that, if approved, would not significantly change the use or dimensions of an existing structure. The other category involves applications for projects that would have "no discernable impact" on adjoining property or the environment. Pisgah's application does not relate to an existing structure. Pisgah's proposed project cannot reasonably be deemed to have "no discernable impact," nor has the Planning Board made any such finding. Therefore, Pisgah's application

7

does not fit within either category of applications as to which the CLUO authorizes a waiver of submission requirements.

The Town and Pisgah contend nonetheless that the iso-contour map requirement can be waived because it is a submission requirement, not a standard, citing *York v. Town of Ogunquit*, 2001 ME 53, 769 A.2d 172; *Perkins v. Town of Ogunquit*, 1998 ME 42, 709 A.2d 106; and *Fitanides v. City of Saco*, 684 A.2d 421 (Me. 1996), cases in which the Law Court has held that a planning board cannot waive zoning ordinance standards but can waive the submission requirements of an ordinance. (*See* Resp.'s Br. 26-27.) This contention misses the point. The point is that, regardless of whether the waiver is of a standard or a submission, a planning board's authority to waive is defined by the terms of the applicable ordinance. Planning boards do not have inherent waiver authority. *Cf. Desjardins v. Town of Greene*, 2002 WL 31546079, at *4 (Me. Super. Oct. 17 2002) (Gorman, J.) ("The Board [of Appeals] cannot simply waive a time limit imposed by the Ordinance because it has spent some time reviewing the case.")

In the case of submission requirements as well as standards, a planning board's authority to waive an ordinance requirement is limited to what the ordinance allows.[2] For example, in the *Fitanides* opinion cited by the Town and Pisgah, the Law Court upheld the planning board's waiver of a submission requirement because the ordinance at issue specifically authorized the board to waive submission requirements. 684 A.2d at 423. On the other hand, in *Jarrett v. Town of Limington*, the Law Court held that the waiver provisions of the applicable ordinance did not permit the planning board to waive a submission requirement requiring the applicant to provide a test or an affidavit regarding water quality. 571 A.2d at 815. The

---

[2] The *Perkins* and *York* decisions are largely irrelevant to this analysis—each involved a planning board's purported but invalid waiver of a zoning standard. Rather, the point here is simply that a planning board's authority is limited by the terms of the ordinance. The Law Court made that point, in upholding the waivers of subdivision standards (but not the waiver of a zoning standard) in *York*, by noting that waiver of subdivision standards was permitted by the terms of the applicable ordinance. 2001 ME 53, ¶ 10 n.9, 769 A.2d 172.

governing principle was the same in both cases: a planning board's authority to waive a submission requirement of the applicable ordinance is defined by the ordinance itself.

Thus, even though the iso-contour map requirement is a submission requirement and not a standard, it still cannot be waived by the Planning Board unless the CLUO authorizes the Planning Board to do so. As noted above, the CLUO waiver provision applies only to applications for projects involving no significant impact, and therefore cannot be construed to apply to Pisgah's wind energy facility proposal.[3] Even if the CLUO is construed, as Pisgah and the Town suggest it should be, to excuse *de minimis* "technical" omissions, the emphasis that the CLUO places upon iso-contour maps precludes any argument that iso-contour maps showing pre-construction background sound levels can be dispensed with on that basis.

In a further effort to excuse the omission of the required maps, the Town and Pisgah argue that it is impossible to produce the iso-contour maps depicting pre-construction sound levels that the CLUO specifically requires. If this is indeed the case, the answer is for the Town to consider revising that part of the Ordinance, not for the Planning Board to dispense with it.

Based on the clear, non-waivable requirement of the CLUO that the applicant for approval of a wind energy facility must submit iso-contour maps depicting pre-construction sound levels as part of the application, Pisgah's admitted failure to submit any such maps means that its application should not have been approved. The CLUO says repeatedly that it is the applicant's burden to demonstrate compliance with the CLUO standards, including the sound standards that apply "everywhere" beyond a 4,000-foot radius, by submitting what CLUO requires (R. 1821, 1831, 1839), and Pisgah has not met its burden.

---

[3] The parties disagree about whether a waiver was requested in writing, as the waiver provision requires, and about whether the Planning Board ever said it wanted to see pre-construction iso-contour maps as opposed to post-construction maps. The court's conclusion that the CLUO does not give the Planning Board authority to waive any iso-contour maps that the CLUO states must be provided as part of the sound study renders these issues moot.

9

C.   *Other Sound Issues*

In light of the foregoing conclusion, the other sound issues that were the subject of remand do not require extended discussion. As Pisgah and the Town contend, where the record contains conflicting evidence—as it does on the issues of calculating the tonal penalty and whether or not the materials submitted by Pisgah can be deemed narratives—the Planning Board is entitled to credit the evidence that it did. One issue deserves further discussion, however.

There is an issue as to whether Pisgah's sound study applied appropriate ground absorption factors in calculating pre- and post-construction low frequency sound impacts. The Planning Board's additional findings note that Pisgah's low-frequency sound analysis uses what the Board calls a "worst case" ground absorption factor of zero—that associated with flat surfaces such as parking lots and water bodies—instead of the higher factors associated with the wooded terrain that actually surrounds the project site. The Beckfords make the logical argument that the sound calculations should utilize the higher ground absorption factors actually associated with the wooded terrain between the turbines and most if not all of the receiver points. At oral argument, Pisgah's representative appeared to concede that, if the higher ground absorption factors associated with the terrain around the proposed facility were used, the results would *not comply* with the CLUO's low-frequency sound standards.

In the court's view, Pisgah and the Planning Board misapply the "worst-case" requirement of the CLUO. The CLUO requirement that the determination of post-construction sound values "should assume worst-case conditions" (R. 1840) refers to the weather factors, primarily as wind speed, that are specifically mentioned in that section. It does not mean the sound study should ignore the terrain over which the measured sounds would actually travel from the turbines to the measurement point. If the calculated sound impacts of

10

the project would exceed either the maximum or the 10dBA differential using any ground absorption factor from 0.0 upward, that is the worst-case scenario the CLUO contemplates. This point actually reinforces the importance of iso-contour maps, which would depict calculated sound impacts at various contour intervals, using the ground absorption factors associated with the terrain that lies between the turbine and each contour.

In the court's view, the worst-case scenario presented by Pisgah and seemingly accepted by the Clifton Planning Board is actually a best-case scenario. The Beckfords make a persuasive argument that, had Pisgah's sound study projected the proposed facility's low-frequency sound impacts at various locations, including but not limited to measurement points, using the ground absorption factors associated with the actual tree cover and terrain at those locations rather than a zero absorption factor, the sound study would not have demonstrated compliance with the CLUO low frequency sound standards.

D.     *Issue of Bias*

Finally, as to the Beckfords' claim that the Planning Board was biased, the court agrees with the Town and Pisgah that, notwithstanding the Planning Board's evident willingness to overlook, excuse and/or waive shortcomings in Pisgah's application, the record does not show actual bias on the part of any Board member.

## Conclusion

For the reasons set forth above, the court concludes that the Town through its Planning Board has not properly applied the requirements of the Clifton Land Use Ordinance to Pisgah's application for a wind energy facility, and therefore that the approval and permits issued to Pisgah's project must be set aside. This outcome does nothing more than hold the Town of Clifton, through its Planning Board, to follow the requirements of the Land Use Ordinance that the Town has chosen to enact, as it relates to industrial wind energy projects.

11

IT IS HEREBY ORDERED:

1.   The appeal of Peter and Julie Beckford is sustained and hereby granted.

2.   The approval and permits granted by the Town of Clifton, through its Planning Board, to Intervenor Pisgah Mountain, LLC's proposed industrial wind energy project are hereby vacated and declared to be of no further effect or validity.

3.   Judgment is hereby awarded to Petitioners Peter and Julie Beckford against the Defendant Town of Clifton and Intervenor Pisgah Mountain, LLC, with costs (not including attorney fees) against Pisgah.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this order into the docket by reference.

Date:   December 10, 2013

A. M. Horton, Justice
Maine Business & Consumer Court

Entered on the Docket: 12/11/13
Copies sent via Mail ___ Electronically ✓

12

**Peter Beckford and Julie Beckford v. Town of Clifton and Pisgah Mountain, LLC**
**BCD-AP-12-10**


**Peter Beckford and Julie Beckford**
    **Petitioners / Plaintiffs**

    ~~Counsel:~~               Pro se


**Town of Clifton**
    **Respondents / Defendants**

    Counsel:            David F. Szewczyk, Esq.
                          One Cumberland Place, Suite 314
                          Bangor, ME 04402


**Pisgah Mountain, LLC**
    **Intervenor**

    Counsel:            William B. Devoe, Esq,
                          Eaton Peabody Attorneys at Law
                          P.O. Box 1210
                          Bangor, ME 04401